NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0016n.06
Filed: January 6, 2006

No. 04-1964

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **Howard T. Linden**, Personal Representative of the **Estate of Luke Devon Griffin**, Deceased, | ) ) ) ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | |
| **Washtenaw County**, **Washtenaw County Community Mental Health**, **SecureCare, Inc.**, **Mohammed Irfan**, MD, **John Kettley**, **Kelly L. Norman**, ACSW, **Laurie Kelly**, **Leonard R. Mellberg**, **Dwight A. Settles**, **Jake Distel**, **Edward E. Postal**, **Brian Wild**, **Loree Roark**, **Gary Greenfield**, **K. Ray**, LPN, **Margaret Lochrie**, RN, **Christina Kemmieu**, SLLP, **Laura MacKimmie**, SLLP, & **Simone Shulman**, MSW, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION** |
| Defendants-Appellees. | | |

Before: DAUGHTREY and COLE, Circuit Judges; BARZILAY, Judge.[*]

**BARZILAY, Judge**. Plaintiff, representative of the deceased Luke Griffin, appeals the

district court's grant of summary judgment for Defendants in a 42 U.S.C. § 1983 action. Plaintiff

claims that Griffin's suicide while being held in jail as a pre-trial detainee resulted from Defendants'

---

[*] The Honorable Judith M. Barzilay, Judge of the United States Court of International Trade, sitting by designation.

deliberate indifference to his serious medical needs. For the reasons set out below, this Court

AFFIRMS in part and REVERSES in part the district court's summary judgment for the Defendants.

## I. Factual Background & Procedural Posture

On July 26, 2000, police arrested 17 year-old Luke Griffin and held him in custody. On

October 15, Griffin told an officer that he was considering hurting himself. Consequently, Griffin

was transferred to a holding area and placed on suicidal precautions. *Linden v. Washtenaw County*,

No. 02-71648, slip op. at 2 (E.D. Mich. July 12, 2004). The next day, Defendant Kelly Norman, a

social worker with Community Mental Health ("CMH"), interviewed Griffin and indicated that he

should remain on suicide precautions since he reported thoughts of strangling himself. *Id.* at 3. On

October 24, 2000, Griffin was released from jail.

Griffin was arrested again on November 9, 2000, and immediately noted as a suicide risk in

the booking documents. Mid-afternoon that day, Griffin met with SecureCare[1] nurse Defendant

Laurie Kelly and informed her that he consumed forty ounces of beer per day, used marijuana, LSD,

ecstasy, and cocaine, ingested three or four Prozac pills the night before, and attempted suicide

during his previous incarceration. Kelly responded by putting Griffin on alcohol withdrawal and

suicide precautions and made a mental health referral.[2] Griffin was then removed from the general

---

[1]Defendant SecureCare, Inc., provides medical staffing to the Washtenaw County Jail clinic.

[2]The treatment included a Librium taper, which alleviates substance-abuse withdrawal symptoms.

holding area and placed in a cell with windows allowing correction officers to monitor him every half-hour. *Id.* at 3-4.

After an altercation with a cell mate on November 10, Griffin was moved to an isolated holding cell. The next day, Defendant corrections officer Brian Wild removed a torn blanket and a piece of string from around Griffin's neck. *Id.* at 4. Kelly examined Griffin for injuries, and later that day Norman spoke with him. During this interview, Griffin began banging his head against the wall, which forced Defendant Lt. Gary Greenfield to intervene and place him in a restraint chair. He remained in the chair for two hours under constant supervision, with Wild making notations every fifteen minutes. Afterward, Griffin returned to his cell, still on suicide precautions. *Id.* Norman telephoned a psychiatric social worker at the University of Michigan, John Kettley,[3] to discuss whether Kettley believed Griffin should be hospitalized – a decision only Kettley had the authority to make. *Id.* at 4-5. He felt hospitalization unnecessary.

On November 13, Norman reported that Griffin seemed calmer and denied having suicidal thoughts, though she believed he remained "fragile and at risk." *Id.* at 5 (citation omitted). Defendant Dr. Mohammed Irfan, a CMH psychiatrist, evaluated Griffin on the evening of November 14 and told Norman that he could be removed from suicide precautions. His decision, along with an accompanying recommendation from Norman, led Griffin to be transferred to the medical block unit for a "transitional period from suicide precautions." *Id.* at 6 (quotations & citation omitted).

The next day, Defendant nurse Margaret Lochrie saw Griffin and removed him from the Librium taper after he complained of visual hallucinations and exhibited an unsteady gait. She also

---

[3]Kettley previously was dismissed from this action. *Id.* at 2.

noted that Griffin denied having thoughts of harming himself. *Id.* at 7. A subsequent evaluation by CMH psychologist Defendant Laura MacKimmie concurred with Lochrie's findings, and MacKimmie recommended Griffin be returned to the cell block.

That evening, Griffin approached Defendant corrections officer Edward Postal and told him of an impending fight with his cell mate. Postal called Defendant classification officer Leonard Mellberg, who told Postal to place Griffin in an isolated maximum security cell. *Id.* at 7. That night Defendant corrections officer Dwight Settles discovered Griffin dead in his maximum security cell with a sheet tied around his neck.

In response to Luke Griffin's suicide, Plaintiff Howard T. Linden, representative of Griffin's estate, brought suit against the Defendants in the Eastern District of Michigan, Southern Division, pursuant to 42 U.S.C. § 1983, claiming they acted with deliberate indifference to his medical needs. *Id.* at 1-2. Defendants Norman, MacKimmie, SecureCare, Inc., Kelly, Lochrie, and the Washtenaw County Defendants[4] filed motions for summary judgment, which the district court granted. Plaintiff appeals the summary judgments for all defendants except CMH.

## II. Standards of Review

### A. Summary Judgment

This Court reviews a district court's grant of summary judgment *de novo*. *See Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998). The Court must examine the evidence in a light most favorable to the nonmoving party to determine whether "the evidence

---

[4]These defendants included Washtenaw County, Washtenaw County Community Mental Health (CMH), Dr. Irfan, Lt. Greenfield, Sgt. Mellberg, and corrections officers Settles, Postal, Wild, Roark, and Distel.

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Noble v. Chrysler Motors Corp., Jeep Div.*, 32 F.3d 997, 999 (6th Cir. 1994) (quoting *Massey v. Exxon Corp.*, 942 F.2d 340, 342 (6th Cir. 1991)) (quotations omitted); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." (quotations & citations omitted) (emphasis in original)). If there exists a genuine issue of material fact – one that "might affect the outcome of the suit under the governing law" – the summary judgment must be overturned. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B. Section 1983 Claims for Deliberate Indifference to Serious Medical Needs**

For a claim under 42 U.S.C. § 1983,[5] a plaintiff must "identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)) (quotations omitted). In the current case, Plaintiff asserts that Defendants deprived the decedent of his Constitutional rights "by failing to provide for his serious medical needs." *Appellant's Br.* at 3. The basis for this claim arises from the Eighth Amendment's prohibition on subjecting prisoners to "unnecessary and wanton infliction of pain,"

---

[5]The relevant part of the statute reads:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.

5

which includes the "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quotations & citation omitted); *see Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001). As the Eighth Amendment does not apply to pretrial detainees, such as the decedent, this right to adequate medical treatment attaches through the Due Process Clause of the Fourteenth Amendment, which affords pretrial detainees rights "analogous" to those of prisoners. *Watkins*, 273 F.3d at 685-86 (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

To demonstrate a violation of this right, a plaintiff must satisfy two tests, one objective and one subjective. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). The objective component requires the plaintiff to "allege that the medical need at issue is 'sufficiently serious.'" *Comstock*, 273 F.3d at 702 (quoting *Farmer*, 511 U.S. at 834). For the subjective component, the plaintiff must demonstrate that "the prison official must have a sufficiently culpable state of mind – one of 'deliberate indifference' to inmate health or safety." *Estate of Novack v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) (quotations & citation omitted); *see Farmer*, 511 U.S. at 829, 834.

More concretely, to establish deliberate indifference, "the plaintiff must allege facts which, if true, would show that the official being sued perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703; *see Farmer*, 511 U.S. at 829, 837. This standard requires that the defendant's *mens rea* be higher than negligence but lower than purposeful or knowing infliction of harm. *See Comstock*, 273 F.3d at 703 ("[A]n official's failure to alleviate a significant risk that *he should have perceived but did not* . . . cannot under our cases be condemned as the infliction of

6

punishment." (quoting *Farmer*, 511 U.S. at 838) (emphasis in original)); *cf. Estelle*, 429 U.S. at 105 ("[A]n inadvertent failure to provide adequate medical care cannot be said to constitute" a violation of the Eighth Amendment.); *Watkins*, 273 F.3d at 686 ("If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments."). A defendant will not escape liability, though, if "'he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 843 n.8).

Thus, in the specific context of detainee suicide – the event at issue in this case – this Court inquires "whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure [by a defendant] to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) (quoting *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992)); *see also Novack*, 226 F.3d at 529 ("[A] prison official must be cognizant of the significant likelihood that [the detainee] may imminently seek to take his own life and must fail to take reasonable steps to prevent the [detainee] from performing this act.").

### III. Discussion

**A. The Objective Test**

The Sixth Circuit has long recognized "that psychological needs manifesting themselves in suicidal tendencies are serious medical needs" in the Eighth Amendment context. *Crocker v. County of Macomb*, 285 F. Supp. 2d 971, 975 (E.D. Mich. 2003) (quoting *Davis v. Fentress County*, 6 Fed.

Appx. 243, 249 (6th Cir. 2001) (citing *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994))), *aff'd*, 119 Fed. Appx. 718 (6th Cir. 2005). Ample documentation reveals that Luke Griffin repeatedly exhibited suicidal tendencies during his detention. *See, e.g.*, J.A. 1382-84. Plaintiff therefore has met the burden of the objective prong of the test for a violation of Griffin's right to adequate medical treatment.

**B. The Subjective Test**

### 1. Nurses Laurie Kelly & Margaret Lochrie and SecureCare, Inc.

Defendants Laurie Kelly and Margaret Lochrie worked as nurses at the Washtenaw County Jail through its contract with Defendant SecureCare, Inc. ("SecureCare"), during Griffin's detention. Plaintiff asserts that Kelly acted with deliberate indifference toward Griffin's health needs when she needlessly placed Griffin on a Librium taper to prevent alcohol and substance abuse withdrawal symptoms. A rapid withdrawal from Librium, if one occurred, could "exaggerate feelings of depression." *Appellant's Br.* at 60. Plaintiff also contends that Defendant psychologist Norman informed Kelly that Griffin was over-medicated, but Kelly never had him evaluated by a physician. If a visit had occurred, a doctor would have surely noticed Griffin's heightened suicidal risk and saved his life. *Appellant's Br.* at 61.

In light of Kelly's documented performance, these claims do not indicate that she acted with deliberate indifference toward Griffin's serious medical needs. After her initial interview with Griffin, Kelly administered substance abuse withdrawal precautions, placed him on suicide precaution watch, and referred him to CMH so that a social worker could see him at least once a day. J.A. 363-66. By contrast, Plaintiff's arguments rely on conjecture and offer nothing more than

8

ephemeral hopes that a possibly-taken action in addition to those Kelly took could have averted Griffin's death. Such musings do not establish deliberate indifference. *See Comstock*, 273 F.3d at 706 ("[I]f [defendant] was not 'failing to treat' [the detainee], or 'doing less than [her] training indicated was necessary' . . . when [she] reevaluated [him] . . ., then [she] cannot be said to have consciously disregarded the risk of serious harm." (quoting *Williams v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999))). The district court's grant of summary judgment for Laurie Kelly is AFFIRMED.

Plaintiff opposes granting nurse Margaret Lochrie summary judgment because she knew of Griffin's suicide attempts after his first arrest and again on November 11, 2000, and so understood that he posed a suicide risk on November 14. Plaintiff claims that when Lochrie saw Griffin on November 15, she realized he was experiencing side effects from the Librium taper and discontinued its use and, according to a progress note written by Defendant MacKimmie, queried whether he should be placed on suicidal precautions. Also, Lochrie wanted to keep Griffin under observation until he recovered from the over-medication. J.A. 1058; *Appellant's Br.* at 58. However, she failed to ensure that her wishes were carried through even though she had authority to carry out this measure. J.A. 1178. Furthermore, according to Plaintiff, Lochrie aggravated the situation by allegedly administering Griffin another Librium dose although she discontinued the regimen.[6] *Appellant's Br.* at 58. This error, Plaintiff claims, "clearly contributed to an increased risk of suicide." *Appellant's Br.* at 59.

Even taking all of Plaintiff's factual claims as true, Lochrie's actions did not approach deliberate indifference. From November 14 to 15, she monitored Griffin for symptoms of substance

---

[6]The accusation that Lochrie suspended the use of the Librium taper and continued to administer it to Griffin makes little sense. *See* J.A. 1062.

abuse withdrawal and even removed him from the taper after he reported feeling "high" and had an unsteady gait and felt drowsy. J.A. 397. On the 15th, she reevaluated Griffin, found him dehydrated and suffering from orthostatic hypotension, and in response immediately planned to boost his fluid intake, place him under medical observation, and check his blood pressure twice a day in the medical unit. J.A. 402-03. Margaret Lochrie persistently evaluated and attended to Griffin's needs and adjusted his treatment accordingly. The lower court's grant of summary judgment in her favor is AFFIRMED.

Throughout Griffin's detention, SecureCare maintained the medical records on his treatment that its nurses and various correction officers created. J.A. 151-52, 167, 179, 187-88. Plaintiff claims that SecureCare's policies and procedures fostered deliberate indifference to Griffin's serious medical needs and that this deficiency caused his suicide. *Appellant's Br.* at 57-58.

To uphold this claim, Plaintiff must identify a policy that constituted the "'moving force' or direct causal link in the constitutional deprivation." *Soles v. Ingham County*, 316 F. Supp. 2d 536, 545 (W.D. Mich. 2004) (quotation omitted), *aff'd*, 148 Fed. Appx. 418 (6th Cir. 2005). Instead, Plaintiff merely sets forth – without explanation – a list of measures that in hindsight that if taken possibly could have saved Griffin's life. "[I]t is a 'settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) (quoting *United States v.*

*Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). Since Plaintiff offers no reasoning or argument that reveals any nexus between a SecureCare policy and Griffin's death, summary judgment for SecureCare is AFFIRMED.

### 2. Kelly Norman & Laura MacKimmie

Defendant Kelly Norman, a certified social worker with the CMH team, bears principal responsibility for evaluating and counseling jail inmates at risk for suicide. J.A. 944; *Appellees Norman & MacKimmie's Final Br.* at 11. Along with Defendant MacKimmie, she ultimately decides whether to place inmates on suicide precautions.

Plaintiff claims Norman acted with deliberate indifference to Griffin's suicidal state because she heeded the advice of Defendant Dr. Irfan regarding Griffin's mental state and removed him from suicide precautions. In fact, she testified that were it not for Dr. Irfan's diagnosis, she would have kept him on suicide precautions. J.A. 979-80. According to Plaintiff, she therefore knew of Griffin's fragile mental state and disregarded the risk. *Appellant's Br.* at 53. Plaintiff also claims Norman informed Defendant Mellberg that he could put Griffin in maximum security on November 15, and thereby ignored the psychological danger isolation posed to Griffin.

Plaintiff's arguments do not withstand scrutiny. At the time of Griffin's first arrest, Norman placed him on suicide precautions because of his suicidal thoughts. J.A. 1383. During his second detention, Norman sought to have Griffin hospitalized after he began banging his head against the wall during an interview. J.A. 1384-85. On November 13, she again evaluated Griffin, noting that

11

he appeared calmer, but remained unstable. Consequently, she sought out the advice of Dr. Irfan, a psychiatrist, who deemed it safe to remove Griffin from suicide precautions. J.A. 1386. At no time did Norman act deliberately indifferent toward Griffin's condition. She visited him twice during his first incarceration, at least four times during his second, executed nine progress notes on his mental health and five reports to the corrections staff. *Appellees Norman & MacKimmie's Final Br.* at 12. Likewise, she placed him on suicide precautions, repeatedly monitored his condition, and consulted experts and officials to ensure he received proper care. Simply because Norman may have been able to avert Griffin's suicide by making a different decision – one that would have contravened the advice of a more learned expert – does not give rise to culpability under the Eighth Amendment. *See, e.g.*, *Comstock*, 273 F.3d at 706 (noting that defendant may prevail "if he 'responded reasonably to the risk, even if the harm ultimately was not averted'" (quoting *Farmer*, 511 U.S. at 844)). In the same manner, if Norman did tell Mellberg he could move Griffin to maximum security – a fact she denies[7] – she would not have acted with deliberate indifference, since by November 14 she believed Griffin no longer posed a threat to his own life. *See Novack*, 226 F.3d at 529. Because no jury could find Norman had acted with deliberate indifference toward Griffin's serious medical needs, summary judgment for Kelly Norman is AFFIRMED.

Defendant Laura MacKimmie, a psychologist, provides backup for Norman at the jail and visited Griffin in that capacity at a nurse's request on November 15, two days after Dr. Irfan and Norman removed him from suicide precautions. J.A. 810, 839. Plaintiff contends that because MacKimmie knew of Griffin's mental health history and on November 15 heard nurse Lochrie's

---

[7]*See infra* n.10.

12

concerns that he be placed back on suicide precautions, MacKimmie's actions constituted deliberate indifference. *Appellant's Br.* at 54. Plaintiff claims that MacKimmie knew Griffin should see a doctor immediately because he appeared over-medicated, but failed to schedule an evaluation that day – an evaluation that "most likely would have recognized [Griffin's] need to be further closely monitored because of his intoxication on psychiatric medications." *Appellant's Br.* at 54.

Again, these arguments hold no merit. Plaintiff ignores that MacKimmie conducted her own evaluation of Griffin and determined that although over-medicated, he showed no desire to harm himself. J.A. 1387. Furthermore, a mere conjecture that scheduling a doctor's appointment to treat a medical problem distinct from Griffin's suicidal tendencies could have saved his life does not demonstrate deliberate indifference. Summary judgement for Laura MacKimmie is AFFIRMED.

### 3. Jacob Distel

Defendant Jacob Distel, Director of Correctional Services for the jail during the relevant period, oversaw Kelly Norman and Laura MacKimmie. J.A. 945-46. During Griffin's detention period, he received daily reports from Norman about Griffin's condition and felt "really worried and very concerned" about him following his November 11 suicide attempt. J.A. 958. He consequently advised Norman that Griffin should receive additional counseling from therapist Shulman, which Griffin unfortunately never received. J.A. 958.

Contrary to Plaintiff's assertions, Distel's expressions of concern and attempt to provide Griffin with extra counseling, despite bearing no fruit, do not constitute deliberate indifference. Distel overtly voiced his worries about Griffin's state and took measures to ameliorate his condition – acts demonstrative of anything but indifference. Plaintiff's parallel claim that the Court should

13

hold Distel liable because of his supervisory role over Defendant Norman also proves groundless.

First,

> [t]he supervisor is not liable for failing to supervise the offending employee unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Comstock*, 273 F.3d at 712-13 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson County.*, 668 F.2d 869, 874 (6th Cir. 1982))). Plaintiff has made no such showing. Second, because this Court affirms the grant of summary judgment for Kelly Norman, there exists no deliberate indifference to impute onto Distel. For these reasons, the Court AFFIRMS summary judgment for Jacob Distel.

### 4. Washtenaw County

"To impose § 1983 liability on a municipality or local governmental entity, plaintiff must show that an officially executed policy, or the toleration of a custom, resulted in a constitutional deprivation." *Soles*, 316 F. Supp. 2d at 544 (citing *Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996)); *see Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997) ("'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." (quoting *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997) (brackets in original)).

Plaintiff's argument against Washtenaw County at best proves inconsistent. While insisting that the county's "policies failed to ensure close observation of Luke [Griffin,]" Plaintiff

simultaneously claims that "according to the county's own training manuals and policies and procedures, [Griffin] warranted close observation." *Appellant's Br.* at 62. It appears Plaintiff cannot decide whether the policies or their execution was at fault. Plaintiff similarly lists policy and training recommendations that he believes would have saved Griffin's life if implemented. *See Appellant's Br.* at 62-63. Pointing out "hypothetical policies that may have prevented [the decedent]'s suicide" does not establish "a deliberate and discernible county policy which caused [Griffin's] suicide." *Crocker*, 285 F. Supp. 2d at 977. The summary judgment for Washtenaw County is AFFIRMED.

### 5. Loree Roark

Defendant Loree Roark was the booking officer when Griffin was transferred into maximum security and took his own life. J.A. 1308. Plaintiff claims that due to her position, Roark knew of Griffin's suicidal state, as the booking department processes suicide-risk classifications and keeps them in the booking records.[8] Likewise, Plaintiff insists that as a booking officer, she had the responsibility to ensure that detainees removed from suicide precautions, such as Griffin, remained in the medical unit for several days before returning to the general population. *See Appellant's Br.* at 50. Roark's failure to halt Griffin's November 15 transfer to maximum security thus constituted deliberate indifference to his serious medical needs. *See Appellant's Br.* at 50. However, officer Roark had little or no direct exposure to Griffin, and Plaintiff has presented no evidence demonstrating that she had knowledge of his condition and acted with deliberate indifference toward his medical needs. The district court's grant of summary judgment for Loree Roark is AFFIRMED.

---

[8]Plaintiff also insists Roark "personally observed and monitored Luke Griffin in the restraint chair on November 11th. *Appellant's Br.* at 49. However, the record to which Plaintiff cites suggests otherwise. *See* J.A. 1306-07.

### 6. Brian Wild

Corrections officer Brian Wild witnessed Griffin's attempted suicide on November 11, 2000, and afterward observed Griffin in the restraint chair. During this episode, he heard Griffin openly express his desire to kill himself and documented the incident. Two days later, Wild noticed Griffin appeared "shak[y]" and to "not feel[] well" and notified the medical department. Plaintiff believes Wild acted with deliberate indifference toward Griffin because he did not tell other coworkers about Griffin's suicidal outbursts, which according to Plaintiff could have saved Griffin's life. *See Appellant's Br.* at 51.

Plaintiff once again argues that the defendant took action, but not enough, and therefore supposedly acted with deliberate indifference. From the facts Plaintiff presents, it appears Wild thoroughly fulfilled his duties and remained attentive to Griffin's needs. Calling for medical assistance when an detainee appears ill does not smack of indifference toward that person's well-being. Summary judgment for Brian Wild is AFFIRMED.

### 7. Edward Postal

Defendant Edward Postal served as the medical housing officer when Griffin was transferred to maximum security on November 15. Plaintiff notes that Postal observed Griffin's suicide attempt on November 11 and thought it "serious." J.A. 1006. Citing this foreknowledge and the training Washtenaw County Jail officers receive to detect suicide risks among inmates, Plaintiff believes Postal should have interpreted Griffin's readily agreeing to go to maximum security as a "change[] in behavior" indicative of impending suicide since Postal knew that isolation aggravated Griffin's suicidal tendencies. J.A. 259; *see* J.A. 311-12. Nevertheless, Postal transported Griffin to maximum

16

security, which according to Plaintiff constituted deliberate indifference to Griffin's serious medical needs.

However, Plaintiff has not presented evidence suggesting that Postal *knew* Griffin was suicidal on November 15. Postal never received briefings indicating that Griffin was currently subject to observation. Griffin was no longer on suicide precautions and "was housed with other guys that had other property, . . . was dressed into . . . a green jail uniform at the time, and . . . had his property with him" – all indications that he was not a suicide risk at the time. J.A. 637; *see* J.A. 259. Deliberate indifference requires that "a prison official must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life." *Novack*, 226 F.3d at 529. "[A]n official's failure to alleviate a significant risk that he *should* have perceived *but did not*, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Id.* at 530 (quoting *Farmer*, 511 U.S. at 838) (emphasis added) (quotations omitted) (brackets in original). Because Plaintiff has not shown knowledge on part of the defendant, summary judgment in favor of Edward Postal is AFFIRMED.

### 8. Dr. Mohammad Irfan

Defendant Mohammad Irfan, a licensed psychiatrist, examined Griffin on the evening of November 14, the night before Griffin committed suicide. J.A. 580-81. Notes from his examination reveal that Griffin told Irfan that he had "feeling[s] of hopelessness, helplessness, and worthlessness." J.A. 1073. Despite these signs of suicide risk and the overt presence of many others, Irfan had Griffin removed from suicide precautions and simply placed on an anti-depressant,[9]

---

[9]The antidepressant would take at least two weeks to have effect. J.A. 1081.

since he "was not verbalizing any suicidal ideation at that time." J.A. 1091; *see* J.A. 1075, 1077, 1079, 1092. Irfan justified his decision by stating that a "[p]erson could be a [suicide] risk [but] may never attempt." J.A. 1078. While this potentially negligent behavior in retrospect seems appalling, it does not establish deliberate indifference since "inadvertent failure to provide adequate medical care cannot be said to constitute" a constitutional violation. *Estelle*, 429 U.S. at 105. More likely, Plaintiff may have a valid state malpractice claim, which does not create section 1983 liability. Consequently, this Court AFFIRMS the grant of summary judgment for Dr. Irfan.

### 9. Dwight Settles

Defendant Dwight Settles handled new arrests and supervised the maximum security unit and holding cells at the Washtenaw County Jail. J.A. 1183. He was working the shift when Griffin was transferred to maximum security on November 15, and found him dead later that evening. *See* J.A. 1191. Plaintiff asserts that Settles knew of Griffin's suicidal tendencies since he bore responsibility for supervising Griffin while on suicide precautions during his first arrest, J.A. 1114, and because Settles would have received briefings on Griffin's November 11 suicide attempt and subsequent need for a restraint chair. J.A. 1195-96. Similarly, Settles normally checks inmates' classifications on the computer when they arrive in maximum security, so he would have realized that Griffin posed a suicide risk. *See Appellant's Br.* at 46. In fact, Settles's own log book from November 15 noted Griffin's past suicidal history. J.A. 1201.

According to his own testimony, Settles could usually hear screams or yells from the maximum security area if a noisy event occurred there. J.A. 1189-90. Plaintiff maintains that before Griffin hanged himself, prisoners in maximum security yelled to alert the guards to Griffin's

18

impending suicide. Plaintiff believes Settles heard the calls for help and chose to "simply disregard[]" them and thus acted with deliberate indifference toward Griffin's life. *Appellant's Br.* at 47. However, Plaintiff erroneously insists that noise emanating from the maximum security area imputes knowledge of Griffin's impending suicide to Settles. That loud noise coming from the maximum security area was so common that Settles could easily discuss under what circumstances a guard would be able to hear such noises implies that the sounds would prove so unextraordinary as to not alert a guard to a problem in the area. *See, e.g.*, J.A. 1193. Further, according to the testimony of inmates in maximum security at the time, Griffin repeatedly pounded on his door because his toilet did not operate properly and informed the guard of the problem when he finally responded. Ten minutes later, he again started to pound on the door. J.A. 1292-93. Such incessant pounding for relatively unimportant problems reasonably would lead Settles to ignore subsequent noise emanating from maximum security. Also, since Griffin was removed from suicide precautions before he entered maximum security, Settles had no reason to believe Griffin would soon commit suicide, let alone to interpret noise from the cells as a warning that Griffin was hanging himself. Nothing in Dwight Settles's actions evidences a deliberate indifference to Griffin's serious medical needs. Therefore, the summary judgment in his favor is AFFIRMED.

## C. Qualified Immunity

The doctrine of qualified immunity aims to protect government officials exercising discretionary functions from civil liability as long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (quotations omitted). In its discussion of qualified immunity, the district court

erroneously rested on Plaintiff's misinterpretation of the law and centered its inquiry on whether jail officials would "have known . . . that placing an inmate in isolation, with a history of previous suicide attempt [sic] and who [is] 'unstable,' [is] deliberate indifference to the inmate's serious medical needs.'" *Linden*, slip op. at 25 (quoting *Pl.'s Resp. Br.* at 45). This analysis adopted an improper scope of inquiry by narrowing the scope of what the district court considered to be the Constitutional violation at bar.

### 1. Standard of Review

This Court reviews summary judgments based upon qualified immunity *de novo*. *Dickerson*, 101 F.3d at 1157. To strip an official of qualified immunity, this Court must first (1) find if a constitutional violation has occurred. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Dickerson*, 101 F.3d at 1157. If a violation indeed has occurred, the Court must then (2) "examine whether [in the context of the specific case,] it involved 'clearly established constitutional rights of which a reasonable person would have known.'" *Dickerson*, 101 F.3d at 1158 (quoting *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir. 1995)); *see Saucier*, 533 U.S. at 200, 201. Determining whether a right is "clearly established," in turn, necessitates an examination of case decisions from the Supreme Court, this Court, other courts within this Circuit, and other circuits, respectively. *See Dickerson*, 101 F.3d at 1158. In a section 1983 claim, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 1158 (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)) (quotations omitted) (brackets in original). This requirement, however, does not narrow the scope

20

of inquiry to the point that "the very action in question has been held unlawful; it . . . mean[s] . . . that in the light of the preexisting law, the illegality of the action must be apparent." *Danese v. Asman*, 875 F.2d 1239, 1242 (6th Cir. 1989) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Once the Court finds the right is clearly established, it must finally (3) decide "whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what [the officer] allegedly did was objectively unreasonable." *Dickerson*, 101 F.3d at 1158 (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994)) (quotations omitted) (brackets in original). If there remains a factual dispute "relating to whether the defendants committed acts that allegedly violated clearly established rights[,]" the Court cannot grant summary judgment. *Id.*

### 2. Leonard Mellberg
#### a. Deliberate Indifference
Defendant Leonard Mellberg, a classification officer during Griffin's detention, knew of Griffin's suicide attempts prior to November 15 and of his threats to kill himself in the future. J.A. 322, 332. He also understood that according to jail policy, inmates normally stayed in the medical unit for several days after coming off suicide precautions so that officials could monitor their behavior. J.A. 1106. Nevertheless, when on the evening of November 15 Edward Postal reported a potential altercation between Griffin and another inmate in the medical unit, Mellberg made the decision to transfer Griffin to maximum security, where he committed suicide later that evening. J.A. 311, 313, 655, 1012.

To validate this decision, Mellberg insists that he had an appointment earlier that day with

Kelly Norman, during which Norman "indicated that if inmate Griffin started acting out that it would be appropriate to place Griffin in the max area." J.A. 313; *see* J.A. 323, 332, 334. Norman flatly denies this conversation occurred, and the circumstances surrounding the alleged conversation suggest that indeed it did not. J.A. 326. Mellberg claims that without prompting or prior knowledge of Griffin's looming altercation with his cell mate, he visited Norman to inquire about moving Griffin to maximum security for "[f]uture planning." J.A. 323; *see* J.A. 337-38, 530. Reenforcing the odd nature of this episode, Mellberg attests that this conversation with Norman involved only Griffin and no other inmates. J.A. 324.

Mellberg also disingenuously attempts to deny knowledge of Griffin's previous suicide attempts and suicidal history. Although he admits reading the report on Griffin's placement in the restraint chair, he claims not to recall reading about Griffin's repeated pleas to have the chair hooked up to electricity so he could die. J.A. 330. As this vivid, memorable episode certainly marks one of the most striking portions of the report on Griffin's restraint chair confinement, it seems odd that Mellberg would forget such a detail. He likewise feigns ignorance with respect to Griffin's November 12 suicide attempt, insisting that he "d[id]n't know that [Griffin] attempted suicide. It [the report] just said he had something wrapped around his neck." J.A. 331. Again, another document, composed by Officer Settles in maximum security on November 15, warned Mellberg to "[k]eep an eye on him [Griffin]. Has been suicidal in the past[.]" J.A. 333. Mellberg claims, "I can't speculate as to what Officer Settles meant by this." J.A. 333. Despite these repeated pledges

22

of ignorance, Mellberg "cannot escape a finding of his subjective knowledge of risk just because he 'declined to confirm the inferences of risk.'" *Comstock*, 273 F.3d at 706 (quoting *Farmer*, 511 U.S. at 843 n.8).

Though the evidence produced to date appears inconclusive, the Supreme Court has noted that in deliberate indifference cases involving prison officials, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact *subject to demonstration in the usual ways, including inference from circumstantial evidence*." *Brooks v. Celeste*, 39 F.3d 125, 128-29 (6th Cir. 1994) (quoting *Farmer*, 511 U.S. at 842) (emphasis & brackets in original). Given the numerous inconsistent and improbable elements within Mellberg's testimony and his intimate involvement with the events culminating in Griffin's suicide, this Court AFFIRMS the district court's finding that a jury could find that he acted with deliberate indifference to Griffin's serious medical needs.

### b. Qualified Immunity

As this Court has affirmed, "the record supports a finding of a constitutional violation [of deliberate indifference to Griffin's serious medical needs] on the part of Mellberg." *Linden*, slip op. at 24. Mellberg therefore satisfies the first prong of the qualified immunity test. For the second prong, the Court must determine if the *constitutional right* violated was so clearly established that preexisting law would alert a reasonable person to its existence. As stated earlier, this Circuit has recognized that suicidal tendencies constitute a serious medical need in the Eighth Amendment context since *Danese v. Asman* and has established an extensive line of cases reiterating this holding. 875 F.2d at 1244 ("The 'right' that is truly at issue here is . . . the right to have steps taken that would

23

have prevented suicide."); *see, e.g.*, *Crocker*, 285 F. Supp. 2d at 975; *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992); *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988). By erroneously honing in on the *specific act* of Mellberg's moving Griffin to an isolation cell, the district court elided the function of this prong of the test: determining whether a *right* is clearly established. The "very action" Mellberg undertook is not pertinent to this inquiry. *Danese*, 875 F.2d at 1242. Thus, because ample case law teaches that deliberate indifference toward a detainee's suicidal tendencies is a violation of Constitutional rights, Mellberg satisfies the test's second prong.

The final component of the test requires an examination of the evidence to determine whether Mellberg's actions – specifically, moving Griffin from the medical unit into an isolated cell in maximum security – were reasonable under prevailing law. During his deposition, Mellberg conceded that before transferring Griffin, he knew Griffin had attempted suicide during both of his detentions and had been placed on suicide precautions. J.A. 325, 330, 332, 335. Further, when Kelly Norman placed Griffin in the medical unit on November 14, 2000, intending that he remain there for up to a week as a step-down from suicide precautions – a standard procedure, Mellberg admits, see J.A. 325 – she informed Mellberg of the transfer and the reasons for it. J.A. 965. Specifically, she told him that "he [Griffin] doesn't do very well when he's isolated . . . . [and] it would be good for him to have other roommates . . ., so if he didn't press a panic button they could press a panic button if it was needed." J.A. 965. This evidence demonstrates that Mellberg had knowledge of Griffin's suicidal tendencies and understood that placing him in isolation aggravated them. Nevertheless, he ignored Griffin's condition and placed him in an isolated cell, fully aware

24

that this act would endanger Griffin's life.[10]    A reasonable person with

[10]To justify transferring Griffin from the medical unit to maximum security, Mellberg contends that Norman told him "it would be appropriate to house him [Griffin] in another area of the facility," J.A. 323; *see* J.A. 324, 325, 334, 337-38, in a conversation that Norman insists did not occur.  J.A. 326; *see also* J.A. 965.  While at first glance the factual dispute seems legitimately contentious, Mellberg's explanation of the alleged conversation suggests it never occurred:

> Q [to Mellberg]: And why did you go to Ms. Norman to talk about Mr. Griffin?
> A [from Mellberg]: To see if there was [sic] any problems with him while he was in the medical area, if there was [sic] any altercations or anything like that, to see if housing in another area would be appropriate.
> Q: What prompted your going to her office about Mr. Griffin?
> A: I don't know if anything prompted me.  It was just something that I would do.
> ....
> Q: All right.  So you went to her [Norman] again.  Tell me the purpose you went to see Ms. Norman about Luke Griffin? [sic]
> A: I went to talk to her to see if it was – if there was a problem with him [sic] getting along with others, if it would be appropriate to house him in another area of the facility.  Future planning.
> ....
> Q: Okay....  Did you go to talk with Ms. Norman about any other inmate at that point in time other than wanting to discuss Luke Griffin?
> A: No.
> ....
> Q: What made you – does every inmate that's in medical have fights with inmates in medical?
> A: Not necessarily, no.
> Q: Right.  So what was there about Luke Griffin that said, hum, I think it's now time for me to walk down to Kelly Norman to see if this gentleman might get into a fight in medical or have an altercation in medical such that I might have to move him?  Why did that enter your head?
> A: Well, Mr. Griffin had problems while he was in the holding area with other individuals and had to be placed in another holding cell so he wasn't around them.

J.A. 323-24; *see* J.A. 325.  Though Mellberg claims he visited Norman to discuss moving Griffin because of Griffin's past behavioral problems, his further testimony renders this excuse – and the entire conversation with Norman – implausible:

> Q [to Mellberg]: If there's a security issue that should generate an incident report?
> A [from Mellberg]: Yes.
> Q: If there's a safety issue that should generate an incident report?
> A: Yes.
> ....

Mellberg's knowledge of Griffin's history would not have transferred Griffin into a solitary cell, and

thus Mellberg's actions satisfy the third prong of the test; he does not receive qualified immunity.

### b2. Disputed Material Facts & Mellberg's Credibility

In addition to the argument outlined above, substantial inconsistencies in Mellberg's

testimony erode his credibility and leave open numerous factual disputes that also prohibit

the Court from granting him qualified immunity. To begin with, Mellberg variously denies

---

> Q: Would you agree that you have not seen *any* incident reports relating to Luke Griffin that were authored on November 12, 2000?
> ....
> A: None that were authored on November 12th, no.
> ....
> Q: And there are no incident reports for Luke Griffin relating to anything on November 13th?
> ....
> A: No.
> Q: You've not seen any relating to November 14th?
> A: No.
> Q: And you've not seen any that related to November 15 except for yours and Officer Postal's, correct?
> A: Right.
> Q: And if, in fact, there are no incident reports [for the dates above], that would be evidence that there were no significant incidents on those days, correct?
> A: Involving this individual, probably not.
> ....
> Q: And in the absence of incident reports for those four days and in the absence of any concerns being raised on the 15th, you decided for your future planning, is that what you are telling us, that you would talk to Kelly Norman?
> A: Yes.
> ....
> Q: So as I understand it then, there was nothing that you had learned in particular about Luke Griffin that had occurred between November 12 and November 15 that prompted you to have the discussion you claim you had with Kelly Norman, correct?
> A: Yes.

J.A. 336-38 (emphasis added).

and admits to having knowledge of Griffin's attempted suicide during his second detention.

*Compare* J.A. 330, 332, *with* J.A. 331, 322.

> Q [to Mellberg]: So you were aware as of the time that you spoke with Ms. Norman that during the course of that [second] incarceration, four days before, Mr. Griffin had attempted suicide . . . ?
>
> A [by Mellberg]: Yes.
>
> . . . .
>
> Q: Okay. So we have now your knowledge, don't we, that he had, in fact, attempted suicide during that second incarceration, right? We know that, don't we?
>
> A: I don't know that he attempted suicide. It just said he had something wrapped around his neck.

J.A. 330, 331. Similarly, he disingenuously insisted he did not understand officer Settles' meaning when Settles wrote in a logbook, "Keep an eye on him [Griffin]. Has been suicidal in the past." J.A. 333 (quotations omitted). When asked what Settles meant, Mellberg responded, "I can't speculate as to what Officer Settles meant by this." J.A. 333. This attempt to deny knowledge of Griffin's psychological problems underscores the unreliability of Mellberg's testimony and the need to pursue further the facts underlying his role in Griffin's suicide.

Finally, Mellberg cannot account for the presence of two different reports detailing Griffin's transfer, even though writing the report was his responsibility. J.A. 327-29. These two texts differed in one crucial manner: The first – which Mellberg admits writing – reads, "CMH worker Norman indicated that if Inmate Griffin started acting out that it would be appropriate to place Griffin in the max area as it was the belief of CMH that Griffin was very manipulative." J.A. 328 (quotations omitted). The second, later report, which Mellberg denies authoring, states that "CMH worker

27

Norman indicates that if Inmate Griffin started acting out that it would be appropriate to place Griffin in the max area as *the SP precautions had been removed* and that Griffin was very manipulative." J.A. 328 (quotations omitted) (emphasis added). Though the origins of this second report remain unclear, it smacks of a cover-up.

The presence in the record of these half-truths, evasive responses, and unanswered factual questions necessitates that this Court REVERSE the district court and strip Leonard Mellberg of qualified immunity.

### 3. Gary Greenfield
#### a. Deliberate Indifference

Defendant Lieutenant Greenfield supervises the Washtenaw County Jail corrections officers. J.A. 1257-58. According to his own testimony, he knew of the risk factors for suicide during the period Griffin was detained. J.A. 1259-60. In addition, he knew of Griffin's suicidal history and efforts to place him on suicidal precautions during his first detention from reading Norman's memo and officer incident reports. J.A. 955, 1266-67. Greenfield also had knowledge of Griffin's suicide attempt on November 11 since he was the responding officer. J.A. 829. Crucially, according to Plaintiff, Greenfield understood Griffin constituted a suicide risk on the evening of November 14 and needed close observation. J.A. 983.

Plaintiff asserts that despite having this knowledge and understanding it to be "very important[,]" Greenfield failed to inform Defendant Settles of Griffin's suicidal risk and history,

even though it was supposedly his responsibility. J.A. 1268; *see* J.A. 1270. If Settles had had access to this information, he could have observed Griffin more carefully. J.A. 1187-88. Further, Plaintiff believes Greenfield ignored his knowledge of Griffin's suicidal history when he concurred with Sgt. Mellberg's decision to transfer Griffin from the medical unit to maximum security on November 15. *See Appellant's Br.* at 43; J.A. 1112.

Plaintiff's claim that Greenfield could have taken steps to ensure his coworkers had a greater awareness of Griffin's mental condition and that doing so may have averted his death does not establish deliberate indifference. Likewise, tacking on conjectures of other possible outcomes that could have arisen if Greenfield had performed his duties more thoroughly does not heighten his level of culpability. Despite these shortcomings, though, Plaintiff presents sufficient evidence to suggest that Greenfield may have acted with deliberate indifference to Griffin's serious medical needs. Greenfield's involvement with Griffin's earlier suicide attempt and confinement to the restraining chair, as well as Kelly Norman's warning to Greenfield on the evening of November 14 that Griffin, though not on formal suicide precautions, remained a suicide threat would have alerted him to the substantial risk posed by moving Griffin to maximum security. J.A. 829, 983, 1266-67. Furthermore, the explicit nature of Norman's warning would have ensured that Greenfield understood from the facts that Griffin posed a suicide risk, fulfilling the first two elements of the deliberate indifference test. J.A. 983. Nevertheless, when Leonard Mellberg decided to transfer Griffin from the medical unit to an isolated cell in maximum security, Greenfield simply ignored the risk and concurred. J.A. 1112. Since a jury could find that Gary Greenfield acted with deliberate indifference toward Luke Griffin's suicidal tendencies, this Court REVERSES the lower court's

29

grant of summary judgment.

### b. Qualified Immunity

As with Mellberg, this Court has found that Greenfield possibly violated Luke Griffin's constitutional rights by acting with deliberate indifference to his serious medical needs. In addition, ample case law within this Circuit, *see supra*, demonstrates that deliberate indifference toward a detainee's suicidal tendencies constitutes a violation of which a reasonable person would be aware. Greenfield therefore satisfies the first and second prongs of the qualified immunity test. Turning to the third prong, the Court must decide whether Greenfield acted reasonably under the prevailing law. Unfortunately, his perpetual, and often absurd, insistence in his deposition that he remembers nothing about the events in question makes it impossible for the Court to determine what events transpired leading to Griffin's suicide and the role Greenfield played in them. For example, he claims not to recall the horrific episode when Griffin was strapped to the restraint chair after attempting suicide and beating his head against the wall, and proceeded to beg jail staff to electrify the chair and kill him, even though Greenfield played a principal role in the event. *Compare* J.A. 829, *with* J.A. 1266. Similarly, after having his memory of the incident refreshed, he evasively denied understanding that Griffin had suicidal tendencies at that time.[11] Because the record before

---

[11]

Q [to Greenfield]: I mean he had a blanket and a piece of string around his neck, right?
....
Q: When he was placed in – you would agree that on November 11, 2000 Mr. Griffin was a high risk for suicide, correct, based upon the information you have here?
A [from Greenfield]: I would agree that he was banging his head against the wall....
Q: Was he a high risk for suicide?
A: You're asking me to speculate. I'm telling you yeah, if today if I had a person

30

the Court expounding on Greenfield's actions and perceptions during the period before Griffin's suicide contains troubling gaps and leaves open factual questions material to determining whether Greenfield acted with deliberate indifference, the Court cannot grant Greenfield qualified immunity at this time. *See Dickerson*, 101 F.3d at 1158.

### IV. Conclusion

Pursuant to the discussion above, it is hereby ORDERED that

the district court's grants of summary judgement for Defendants Washtenaw County, SecureCare, Inc., Dr. Mohammed Irfan, Kelly Norman, Laurie Kelly, Dwight Settles, Jake Distel, Edward Postal, Brian Wild, Loree Roark, Margaret Lochrie, and Laura MacKimmie are AFFIRMED; it is further ORDERED that

the district court's denial of summary judgment for Leonard Mellberg is AFFIRMED; it is

---

with something tied around their neck, he would go on suicide observations. If he was banging his head against the wall, he would go on suicide observations.
Q: What about back in 2000; is it any different?
A: I don't know. I don't remember 2000.
....
Q: And Wild also describes while he was sitting and talking to Griffin, he repeatedly on numerous occasions stated his desire to die, wanting and asking for electricity to be hooked up to the chair. He stated he has no family or friends ....
He does not want to go to prison, and would rather die. He also stated that no matter where we house him or what he [sic] give him to wear, he will attempt suicide again in the future, but we will not stop him.
....
Q: Do you agree that based upon his statements, he's a high risk for suicide?
A: I would agree that we responded to that behavior. I can't speculate whether or not he's suicidal or not.

J.A. 1267-69.

further ORDERED that

the district court's grant of qualified immunity to Leonard Mellberg is REVERSED; it is further ORDERED that

the district court's grant of summary judgment for Gary Greenfield is REVERSED; it is further ORDERED that

Gary Greenfield does not receive qualified immunity; it is further ORDERED that

this case is remanded to the district court for trial.