RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0157p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

CRISTI CAMPBELL, Administratrix of the Estate of
Bryana Baker,

>> *Plaintiff-Appellant*,

*v.*

>> No. 23-3793

APRIL RIAHI, individually and in her official capacity
as an employee of Butler County, Ohio; RICHARD K.
JONES, individually and in his official capacity as
Sheriff of Butler County, Ohio; BUTLER COUNTY,
OHIO; BUTLER COUNTY BOARD OF COMMISSIONERS,

>> *Defendants-Appellees*.

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:20-cv-00678—Douglas Russell Cole, District Judge.

Argued: June 12, 2024

Decided and Filed: July 29, 2024

Before: KETHLEDGE, LARSEN, and BLOOMEKATZ, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Jacqueline Greene, FRIEDMAN, GILBERT + GERHARDSTEIN, Cincinnati,
Ohio, for Appellant. Angelica M. Jarmusz, FISHEL, DOWNEY, ALBRECHT &
RIEPENHOFF LLP, New Albany, Ohio, for Appellees. **ON BRIEF:** Jacqueline Greene, M.
Caroline Hyatt, FRIEDMAN, GILBERT + GERHARDSTEIN, Cincinnati, Ohio, for Appellant.
Angelica M. Jarmusz, Daniel T. Downey, FISHEL, DOWNEY, ALBRECHT & RIEPENHOFF
LLP, New Albany, Ohio, for Appellees.

---

**OPINION**

---

KETHLEDGE, Circuit Judge.   In September 2018, Bryana Baker committed suicide in the Butler County Jail, where she had been booked following her arrest on state charges.  Baker's mother, Cristi Campbell, thereafter brought this suit against the County Defendants, Sheriff Richard Jones, and a corrections officer, April Riahi, asserting claims under 42 U.S.C. § 1983 and Ohio law.  The district court granted summary judgment to the defendants.  We affirm.

I.

We recite the facts in the light most favorable to Baker's mother.  On September 19, 2018, police officers in Hamilton, Ohio, arrested Baker on state charges and took her to the Butler County Jail.  The next morning, she began to experience drug-withdrawal symptoms and became disruptive, so corrections staff moved her from one part of the jail to another.  During that move Baker tried to escape, but a corrections officer quickly caught up with her.  Corrections staff charged Baker with a disciplinary infraction, reclassified her as a "maximum-security" inmate, and sanctioned her with 60 days in disciplinary isolation, during which she would be housed in an "isolation cell" with another inmate.  A prosecutor also charged Baker with felony escape.  *See* Ohio Rev. Code § 2921.34.

Later that morning, a social worker at the jail, Becky Brown, conducted a mental-health assessment of Baker.  Baker told Brown that, prior to her arrest, she had been consuming methadone and alcohol daily, and fentanyl "here and there."  She also said she had been diagnosed with bipolar disorder and depression, but had stopped taking her medication years before.  When Brown asked Baker why she had tried to escape, Baker said she "just" wanted help with her withdrawal symptoms.  She also said that she was not suicidal, that she had never attempted suicide, and that she would notify someone if she felt otherwise, because she had two children "she lived for."  After that conversation, Brown concluded that Baker need not be placed on suicide watch, and thus cleared her to return to her cell.

Soon thereafter, Sergeant Vee Hurst escorted Baker to the "J-Block," which housed certain female detainees (including those assigned to disciplinary isolation). According to Hurst, Baker was "upset and crying," said that she "couldn't believe she had tried to escape," and explained that she was "withdrawing from the drugs." Once Hurst and Baker arrived, Hurst left Baker with defendant April Riahi, the sole corrections officer on duty at the time.

The parties dispute what happened next. Viewed in the light most favorable to Baker's mother, however, a reasonable jury could find that, about an hour after Baker arrived in the J-Block, Riahi decided to place her on suicide watch—apparently because she was acting "erratically" and saying that corrections officers "were trying to kill her." (Riahi denies making that decision. According to Riahi, sometime that morning, her supervisor, Sergeant Theresa Rumpler, called to tell her that someone on the corrections staff had placed Baker "on watch." But Rumpler denies ever making that phone call, and Rumpler undisputedly did not work that day. Thus, a reasonable jury could find Riahi's testimony on this point not credible.) Riahi then moved Baker's personal belongings into a janitorial closet, and recorded in the jail's computer system that Baker had been placed "on watch." Meanwhile, another corrections officer escorted Baker to a suicide-watch cell in the jail's booking area, where she remained overnight.

The next day, September 21, Becky Brown spoke with Baker for a second time. Baker again denied feeling suicidal, but Brown concluded that, because Baker's drug-withdrawal symptoms had gotten worse, she should remain on watch for at least another 24 hours. On September 22, Brown spoke with Baker again, and again Baker denied feeling suicidal. Yet corrections officers told Brown that Baker had been acting erratically that morning, so Brown kept her on watch for another 24 hours. The next day, September 23, another social worker at the jail, Michelle Reimer, evaluated Baker. Baker told Reimer that she was confused "as to why she was placed on suicide watch," and said "she could not commit suicide" because she had a family and children. She also said her drug-withdrawal symptoms had improved. Yet Reimer concluded that, because Baker was "not able to articulate coping skills," she should remain on watch pending "further assessment."

The next afternoon, September 24, a third social worker at the jail, Christina Dingledine, evaluated Baker. For the fifth time, Baker denied feeling suicidal; she also said she was no

longer withdrawing, and explained that she planned to "cope" with her incarceration by positive self-talk, reading, and walking. She further reported that she had support from her family, including her mother, grandmother, and two children. After that conversation, Dingledine removed Baker from suicide watch, concluding that her "current risk level" was "low." Yet Dingledine also recorded in Baker's medical chart that she "was not cleared single-celled"—meaning that Baker's cell door should remain open whenever she was alone. That finding was related to the jail's "single-celling" policy, under which corrections officers were required to obtain approval from the mental-health staff before placing any inmate alone in a closed-door cell (regardless of whether that inmate had been on suicide watch).

Later that afternoon, Baker was transferred back to the J-Block to begin 60 days in disciplinary isolation, the sanction for her escape attempt. When she arrived, a corrections officer placed her in Cell J38 with another inmate on disciplinary isolation, Rosanna Herbert. The record contains few details about what happened that afternoon; but another inmate, Meah Virge, said that at some point Riahi "came into" the J-Block and called Baker a "whore" and a "drug-addict bitch" in front of the "whole pod."

Around noon the next day, September 25, Baker's cellmate, Herbert, left the jail to go to court. At that point, Officer Riahi was the sole corrections officer on duty in the J-Block. Once Herbert left, Riahi kept Baker's cell door open, consistent with the jail's "single-celling" policy. Although Riahi could not access Baker's medical chart (in which Christina Dingledine had earlier recorded that Baker was "not cleared single-celled"), she knew that the mental-health staff had not cleared Baker for "single-celling."

Over the next few hours, Riahi made "observation rounds" every forty minutes, during which she "checked on" Baker four or five times. According to Riahi, Baker's demeanor was pleasant and each of their interactions was friendly. Baker's mother says that Riahi's testimony on that point is not credible, however, in light of Meah Virge's account of what Riahi had apparently said to Baker the day before—namely, that Baker was a "whore" and a "drug-addict bitch." In any event, the parties agree that Baker never expressed suicidal ideation to Riahi or anyone else in the jail.

Meanwhile, at some point that afternoon—likely around 4:00 p.m.—Herbert arrived back from court and returned to the cell she shared with Baker. About a half hour later, Baker called Riahi (using an intercom in her cell) and reported that Herbert had "threatened" her. Riahi went to investigate and found Baker and Herbert yelling at each other, "saying, she's crazy, no she's crazy, get her out of my cell." Riahi tried to calm them down, but they kept "bickering back and forth," so she promptly called another jail official, Noah Fisher, to see whether he could find them new cellmates. Fisher apparently could not, so Riahi called her supervisor, Sergeant Vee Hurst, and told her that Baker and Herbert were arguing. Hurst told Riahi to "handle it," and suggested that she "get them different cellmates" when she had time.

A few minutes later—about 4:45 p.m.—Riahi heard Baker and Herbert yelling at each other again, this time louder than before. Riahi therefore separated them by moving Herbert to an adjacent cell (Cell J39), the only then-vacant cell in the J-Block. At that point, Riahi kept both Baker and Herbert's cell doors open, mindful of the jail's "single-celling policy." She then called Hurst for a second time, told her she had separated them, and said she was trying to find them new cellmates. She also recorded in the jail's computer system (at 4:53 p.m.) that "[i]nmates Baker and Herbert had to be separated due to continuous arguing, while in isolation. The arguing had escalated into verbal threats. Due to the ongoing issues, both inmates were separated[.]"

Less than ten minutes later, right around 5:00 p.m., Baker threw Herbert's "papers" onto the floor outside her cell and yelled, "come get [your] shit." Baker and Herbert then started chasing one another "in and out" of their cells on the second floor of the J-Block. Riahi therefore promptly separated them, walked Baker back to Cell J38, and closed the cell door. She then closed Herbert's cell door, returned to the first floor, and called Hurst for a third time. According to Hurst, Riahi told her that "she had to shut their doors" because they kept "running into each others cells" and "screaming at each other." Riahi and Hurst then began discussing what to do next.

Not more than ten minutes later, while Riahi was still on the phone with Hurst, another inmate yelled out that Baker "was hanging in her cell." Riahi hung up the phone and ran to Baker's cell, where she found her hanging from a bedsheet tied to her locker. Riahi removed

Baker from the bedsheet, began administering CPR, and called for an ambulance. Paramedics soon arrived and took Baker to the hospital, where she died a few days later.

Baker's mother thereafter sued Officer Riahi, Butler County Sheriff Richard Jones, and Butler County, asserting claims under 42 U.S.C. § 1983 and Ohio law. She alleged that Riahi had been deliberately indifferent to the risk that Baker would commit suicide, in violation of the Fourteenth Amendment. She also alleged a supervisory-liability claim against County Sheriff Jones, and municipal-liability claims against Butler County. She further alleged state-law claims against Riahi and Jones for wrongful death and negligence. The district court later granted summary judgment to the defendants on all claims. This appeal followed.

## II.

We review the district court's decision de novo. *See Gambrel v. Knox County,* 25 F.4th 391, 399 (6th Cir. 2022). We may affirm on any basis supported by the record. *See Boler v. Earley*, 865 F.3d 391, 414 (6th Cir. 2017).

## A.

Baker's mother first argues that the evidence in her case would allow a reasonable jury to find that Officer Riahi was deliberately indifferent to the risk that Baker would commit suicide, in violation of the Fourteenth Amendment. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Riahi counters that she is entitled to qualified immunity on the facts as we must construe them here. To demonstrate she is not entitled to that immunity, Baker's mother must show that (1) Riahi violated Baker's constitutional rights and that (2) those rights were "clearly established" at the time of the challenged conduct—meaning the caselaw would have made clear to Riahi that her conduct "was unlawful in the situation [s]he confronted." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotations marks omitted).

We skip to the question whether Riahi's action violated any clearly established right. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The Fourteenth Amendment requires (among other things) that jail officials take reasonable measures "to protect pretrial detainees from harm." *Lawler v. Hardeman County*, 93 F.4th 919, 926 (6th Cir. 2024). At the time of the

alleged constitutional violation here, a plaintiff alleging a Fourteenth Amendment deliberate-indifference claim needed to prove two elements: first, that the detainee faced a "substantial risk of serious of harm"; and second, that the defendant understood yet "consciously disregarded" that risk—meaning the defendant knew of the risk and responded unreasonably to it. *Farmer v. Brennan*, 511 U.S. 825, 837, 840 (1994); *see Beck v. Hamblen County*, 969 F.3d 592, 600-02 (6th Cir. 2020). An unreasonable response, in this context, means a response that amounts to more than ordinary negligence. *See Farmer*, 511 U.S. at 835 (citation omitted); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna,* 577 U.S. 7, 11 (2015) (per curiam) (internal quotation marks omitted). A case "directly on point" is not required for a plaintiff's right in particular circumstances to be clearly established; but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). That means, except in an "obvious" case, the plaintiff must point to pre-existing Supreme Court or Sixth Circuit precedent that would have put a reasonable officer on notice that her specific conduct was unlawful. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (per curiam); *see also Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992-93 (6th Cir. 2017).

Here, regardless of whether Riahi subjectively perceived the potential risk that Baker would commit suicide, Baker's mother has not cited—nor have we found—any case that would have put Riahi on notice that her decision to close Baker's cell door was "so unreasonable as to violate the Fourteenth Amendment." *Beck*, 969 F.3d at 595. At that time, Riahi was responding to an ongoing altercation between two cellmates, which had escalated over the course of nearly thirty minutes. Twice Riahi tried to defuse the altercation; but when Baker and Herbert started "going in and out" of their cells attempting "to get" each other, Riahi closed each of their cell doors "to avoid a physical altercation." At that moment—as the sole corrections officer on duty—Riahi was forced to balance competing exigencies: the potential risk that Baker might harm herself, on the one hand, and the risk that Baker and Herbert might harm each other (or another inmate), on the other. No "clearly established law" from our court or the Supreme Court

"prohibited" Riahi from balancing those considerations by closing Baker's cell door for ten minutes while seeking assistance from her supervising officer. *City of Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (per curiam); *see Arrington-Bey*, 858 F.3d at 992.

Each of the cases that Baker's mother cites is materially distinguishable from this one. She first argues that we should deny immunity to Riahi under our decision in *Troutman v. Louisville Metro Department of Corrections*, 979 F.3d 472 (6th Cir. 2020). In that case, like this one, medical staff had cleared the inmate to return to the prison's general population on the ground that he was not suicidal; and in that case a corrections officer later placed the inmate in a closed-door single-cell without medical authorization. *Id*. at 478-79. The similarities essentially end there. In *Troutman*, the corrections officer undisputedly knew that the inmate had attempted suicide the week before, and later admitted that his "gut reaction" counseled against moving him to a single cell. *Id*. at 480. More to the point, the officer there made a calculated judgment to move the inmate to a single cell days after he received a "disciplinary infraction." *Id*. at 479-80. Here, by contrast, Officer Riahi's decision to close Baker's cell door came in the midst of a fluid, escalating altercation that presented competing exigencies. *Cf. County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998) ("[L]iability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations."). *Troutman* involved no such exigencies and thus does not "govern the facts of this case." *Rivas-Villegas*, 595 U.S. at 6.

The same is true of the next case that Baker's mother cites, namely, *Perez v. Oakland County*, 466 F.3d 416, 423 (6th Cir. 2006). In *Perez*, as in *Troutman*, the officer's decision to single-cell the inmate involved no immediate tradeoff between competing interests. *Id.* at 421-22, 425-26. So that case too does not clearly establish that Riahi's conduct was unlawful in this one.

Finally, Baker's mother cites our unpublished decision in *Linden v. Washtenaw County*, 167 F. App'x 410, 415 (6th Cir. 2006). But "unpublished cases cannot define clearly established law." *Bell v. City of Southfield,* 37 F.4th 362, 368 (6th Cir. 2022) (citation omitted). And *Linden* is distinguishable for the same reasons as *Troutman* and *Perez* are. True, in *Linden* the

corrections officer placed the inmate in an "isolated maximum security cell" to avoid a "potential altercation." *Linden*, 167 F. App'x at 414, 423. But that altercation was not ongoing and hence the corrections officer was not required to balance competing exigencies on-the-spot. *See id.* at 414, 423-24.

At the time of Baker's suicide, no case from the Supreme Court or this court established that Riahi's actions were unconstitutional at the time she took them. Riahi is therefore entitled to qualified immunity as to the federal claim against her.

B.

Baker's mother next argues that the district court mistakenly dismissed her supervisory-liability claim against County Sheriff Richard Jones. Yet a "necessary predicate" of supervisory liability under § 1983 "is the existence of clearly established law indicating the subordinate's actions were unconstitutional." *Bambach v. Moegle*, 92 F.4th 615, 629-30 (6th Cir. 2024); *see Peatross v. City of Memphis*, 818 F.3d 233, 245 (6th Cir. 2016). Here, as shown above, Officer Riahi did not violate Baker's clearly-established constitutional rights; so the derivative claim against Sheriff Jones likewise fails.

C.

Baker's mother also asserts various municipal-liability claims against Butler County. To establish municipal liability for a constitutional violation, a plaintiff must show that her injuries were caused by a municipal "policy or custom." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

Baker's mother first argues that Butler County is liable for Officer Riahi's alleged constitutional violation because (she says) the County has a policy of inadequately training and supervising its officers, a "custom of inaction to constitutional violations," and no "effective system for communicating" concerns about inmate health and safety. To establish municipal liability on any of these bases, Baker's mother must prove (among other things) that the County's various failures amounted to "a policy of deliberate indifference" to Baker's constitutional rights. *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996); *see Mosier v.*

*Evans*, 90 F.4th 541, 549 (6th Cir. 2024).  Yet a municipality "cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established."  *Arrington-Bey*, 858 F.3d at 994 (internal quotation marks omitted).  Thus—because Officer Riahi did not violate a clearly established right—it follows that her employer, Butler County, was not deliberately indifferent to such a right.  *See id.* at 995.  Butler County is entitled to summary judgment on these claims.

Baker's mother also argues that Butler County can be held liable under § 1983 because, she says, it "ratified" Riahi's actions by concluding later that she "used appropriate judgment[.]"  Yet the County approved of Riahi's actions only after the putative violation occurred, which means that the County itself did not cause it.  *See Pineda v. Hamilton County*, 977 F.3d 483, 496 (6th Cir. 2020).  Butler County is therefore entitled to summary judgment on this claim as well.

D.

Finally, Baker's mother argues that Riahi and Jones acted recklessly and thus should not receive Ohio statutory immunity as to the state-law claims for wrongful death and negligence.  Officers are entitled to that immunity from Ohio state-law claims unless they acted "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b).  As relevant here, an officer acts in a reckless manner when she consciously disregards or is indifferent towards "a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Argabrite v. Neer*, 75 N.E.3d 161, 164 (Ohio 2016).  That definition creates "rigorous standards" that are "difficult to establish[.]" *Id.*

Here, Baker's mother must show that Riahi's decision to close Baker's cell door for ten minutes—under the circumstances Riahi encountered then—was so "perverse" as to amount to "substantially greater than negligent conduct." *A.J.R. v. Lute*, 168 N.E.3d 1157, 1161-62 (Ohio 2020); *see Caudill v. City of Columbus*, 97 N.E.3d 800, 807 (Ohio Ct. App. 2017).

When Riahi closed Baker and Herbert's doors, she was responding to an ongoing and escalating altercation that required her to balance competing hazards to Baker and other prisoners.  Baker's mother argues that—rather than close the door to both Baker and Herbert's

cells—Riahi should have closed only Herbert's cell door. But at that point Riahi had reason to think that Baker might have posed a threat to inmates other than Herbert—in part because, moments before Riahi shut Baker's cell door, Baker had undisputedly chased Herbert into her cell near a second-floor railing, during which time another inmate was passing out dinner trays nearby. And had Baker harmed that inmate (or any other), that inmate may well have sued Riahi for failing to protect her from a substantial risk of harm. *See, e.g., Rager ex rel. G.C. v. McMinn County,* 2023 WL 4927252, at *2 (6th Cir. Aug. 2, 2023) (stating that an officer "had a duty to immediately segregate" a dangerous inmate). Baker's mother also argues that "Baker could have been placed in booking." That might be true, but Baker's mother offers no evidence that Riahi could have moved Baker to booking *right at that moment*; for it is also undisputed that Riahi was the sole corrections officer on duty in the J-Block, and thus could not have left her post to escort Baker there.

Moreover, the arguments that Baker's mother makes now come with the benefit of hindsight, as well as a degree of reflection—in which Riahi herself had little ability to engage during the short, chaotic interval at issue here. Nor does anyone dispute that—during that interval—Riahi sought to minimize the time during which the two inmates' doors were closed. "[T]he standard for proving recklessness is high, so a court may enter summary judgment in those cases where the conduct does not indicate a disposition to perversity." *Caudill*, 97 N.E.3d at 807. Although the question is arguably close, we conclude that a reasonable jury could not find that Riahi's conduct during that short interval was so perverse as to amount to recklessness under Ohio law. *Neer*, 75 N.E.3d at 164; *see Arrington-Bey*, 858 F.3d at 996. She is therefore entitled to Ohio statutory immunity.

Finally, as to the state-law claims against Sheriff Jones, Baker's mother makes no argument for why the Sheriff acted "recklessly" under Ohio law, nor otherwise explains why he should be held liable for the actions of his subordinate, Riahi. As a result, Baker's mother has forfeited these claims. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

\*       \*       \*

The district court's judgment is affirmed.