RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0112p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DAVID LOVELL, as Personal Representative of the
Estate of Chase Lovell,

*Plaintiff-Appellee*,

*v.*

COUNTY OF KALAMAZOO, MICHIGAN, *et al.*,

*Defendants*,

LINDSEY O'NEIL; INTEGRATED SERVICES OF
KALAMAZOO, a political subdivision of the State of
Michigan,

*Defendants-Appellants.*

No. 24-1876

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:22-cv-00567—Jane M. Beckering, District Judge.

Argued: January 29, 2026

Decided and Filed: April 10, 2026

Before: GIBBONS, LARSEN, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Richard V. Stokan, Jr., KERR, RUSSELL AND WEBER, PLC, Detroit, Michigan,
for Appellants. Christopher T. Putrycus, MARKO LAW, PLLC, Detroit, Michigan, for
Appellee. **ON BRIEF:** Kevin A. McQuillan, KERR, RUSSELL AND WEBER, PLC, Detroit,
Michigan, for Appellants. Christopher T. Putrycus, Jonathan R. Marko, Tyler M. Joseph,
MARKO LAW, PLLC, Detroit, Michigan, for Appellee.

_____

**OPINION**

_____

MURPHY, Circuit Judge.   Chase Lovell's mental-health struggles repeatedly led him to try to take his life.  He arrived at a Michigan jail after starting a fire at a psychiatric hospital during one such suicide attempt.  Lindsey O'Neil oversaw this jail's mental-health unit.  She originally ordered that Lovell stay in a padded cell and wear a suicide-prevention gown.  When she later evaluated Lovell, however, she could tell that the padded cell and gown were causing him mental distress.  O'Neil thus came up with a compromise.  To alleviate the mental strain, she would move him to a less isolated cell and give him a regular jumpsuit.  To reduce the risk that he would commit suicide, she would require Lovell to have a suicide-prevention blanket instead of regular bedding.  Unfortunately, jail staff still gave Lovell regular bedding as a result of some type of miscommunication.  Lovell used a sheet to commit suicide.  His estate sued O'Neil, among several other defendants.  The district court granted summary judgment to all defendants but O'Neil.  She has appealed.  We agree with O'Neil that no case would have clearly established that her compromise placement decision showed deliberate indifference to the risk that Lovell would commit suicide.  Qualified immunity thus shields O'Neil from this damages suit.  We reverse.

I

Lovell grew up in Manton, Michigan, and graduated from Manton High School in 2010.  Although doctors diagnosed him with attention deficit disorder, he otherwise was a normal student.  In the decade after high school, he worked at a variety of jobs in northern Michigan.

Lovell began to struggle with his mental health around the age of 22 after a man sexually assaulted him.  From then on, he regularly heard "voices" that made it difficult for him "to distinguish what is real and what is not[.]"  Med. Rec., R.84-2, PageID 1359.  The voices also caused him to talk to himself and suffer from paranoia.  He abused alcohol to "numb" his mental distress.  Welihan Dep., R.101-3, PageID 4520.  His drinking, in turn, led him to commit various crimes, including theft, assault, and driving offenses.

While incarcerated, Lovell started to obtain mental-health treatment.  In 2016, he spent two weeks at a psychiatric hospital.  Doctors eventually diagnosed him with (among other things) schizoaffective disorder, bipolar disorder, and substance-abuse disorders.  His depression also led him to contemplate suicide.

In 2020, Lovell's mental-health struggles spiraled downward because of difficulties in his personal life and mounting legal troubles.  In March and April of that year, he twice admitted himself to an inpatient psychiatric hospital.  According to his mother, he made these visits because the "voices" in his head "were telling him to kill himself" and he was suffering from depression.  *Id.*, PageID 4561.

After breaking up with his girlfriend in May, Lovell decided to live with his mother.  The same month, his mother took him to a second psychiatric hospital.  During this treatment, Lovell shared a "thought to get drunk and then hang himself."  Med. Rec., R.84-2, PageID 1359.  The health-care providers thought that he posed a "high risk for suicide" during his week-long stay. *Id.*, PageID 1361.

After Lovell's discharge, he began to receive outpatient therapy from Integrated Services of Kalamazoo.  This governmental agency treated him with various medications, including shots of the antipsychotic drug Invega Sustenna for his schizoaffective disorder.  Lovell, however, took his regular medications inconsistently and continued to abuse alcohol.

His distress worsened even more in July 2020 when his mother had to leave him for much of the day due to her work.  By the middle of that month, he was again "hearing voices" and desiring to kill himself.  Welihan Dep., R.101-3, PageID 4582.  So his mother took him to the emergency room at Borgess Hospital.  The hospital referred Lovell to a crisis housing center. But Lovell tried to cut his wrist with a stick during his short stay there.  So the hospital next admitted him to its psychiatric unit.  While there, Lovell again disclosed "thoughts of suicide," suggesting that he had come up with "a plan to either cut his wrists or poison himself with car exhaust[.]"  Med. Rec., R.84-5, PageID 1387.  He received another Invega Sustenna shot, among other medications.  When the hospital discharged him after several days, he denied having any "suicidal or homicidal" thoughts.  *Id.*, PageID 1389.

For the next few months, Lovell continued to receive outpatient treatment. At first, Integrated Services of Kalamazoo provided this care. Yet that October, Lovell moved to Grand Rapids with his mother. Integrated Services thus referred him to another provider. This move proved short lived. In December, he returned to Kalamazoo County and reestablished contact with Integrated Services.

Before Lovell could seek more outpatient treatment, though, his mother took him to Borgess Hospital's emergency room on December 12. An intoxicated and suicidal Lovell told a health-care provider that "he wanted to die" and planned to "slit his wrists" that day. Med. Rec., R.101-7, PageID 4713. The hospital readmitted him to its psychiatric unit. It gave Lovell various medications (including another shot) during this admission, and the first few days passed by in a "fairly uneventful" way. *Id.*, PageID 4717.

Things changed on December 15. That day, Lovell lit his mattress on fire and twice tried to escape the hospital during the ensuing commotion. Hospital staff had to physically restrain Lovell and give him additional medications. While placed in a seclusion room, he tried to cut his wrists on a countertop. Staff thus decided he had to go to jail for safety reasons. Still, a doctor's discharge report made clear that Lovell "currently represent[ed] a significant danger to both himself and others" and that Lovell would require "very close supervision" for the foreseeable future. Med. Rec., R.84-15, PageID 1488. When the police arrived, Lovell confessed that he had started the fire to "kill himself." Police Rep., R.88-5, PageID 1704. Late in the afternoon, officers took him to the Kalamazoo County Jail on arson charges.

Lindsey O'Neil, a licensed social worker, managed the jail's mental-health unit as an employee of Integrated Services. She received a call from an officer at the hospital to alert her that a detainee who had been in the psychiatric unit for suicidal ideation would soon arrive. She did not know Lovell and thus reviewed Integrated Service's medical records for him. She also spoke with a nurse at the hospital to ask for his hospital records and identify his medications. After Lovell arrived, O'Neil decided to wait to interview him to give him a "cooling-off period for a time." O'Neil Dep., R.84-12, PageID 1443. She placed him in a padded cell with a suicide-prevention gown and blanket "until he could be properly screened" the next day. *Id.*

On the morning of December 16, O'Neil undertook this "suicide evaluation" of Lovell. *Id.* At that time, she still had not received most of Lovell's hospital records, including the discharge report that highlighted his suicide risk. Her screening lasted about 20 minutes. Lovell admitted that he had tried to commit suicide in the past. But he offered no details about his prior attempts and claimed that he had never tried to kill himself in jail. He also denied feeling suicidal and agreed to notify jail staff if those feelings returned. O'Neil believed that Lovell was not "actively suicidal" but recognized that his suicidal ideation might come back at any time. *Id.*, PageID 1445. On the other hand, Lovell's placement in the padded cell and his suicide-prevention gown were "causing him more distress." *Id.*, PageID 1451, 1459. He thus was "invested" in getting a regular jumpsuit (rather than the gown). O'Neil Note, R.84-11, PageID 1430.

While coordinating with a captain at the jail, O'Neil decided on a general plan. She let Lovell leave the padded cell and wear a regular jumpsuit. But she moved him to a medical cell (rather than general population) because of the risk that he might try to escape again. And she gave him a suicide-prevention blanket (rather than a regular sheet and blanket) because of the increased dangers from normal bedding if his suicidal thoughts returned. She also asked the tower to have Lovell's cell continuously on a camera screen for closer monitoring. And she "encouraged" officers to have "regular interactions" with him. *Id.*

Lovell moved to the medical cell with a suicide-prevention blanket later that day. Another social worker saw him after this move to help him during the arraignment process. A state judge ordered Lovell to post a higher-than-expected bond to get released. Although this development upset him, he again denied feeling suicidal.

Tragically, that last denial proved false. An apparent miscommunication with corrections officers left Lovell with normal bedding in his medical cell. The next day, he used a sheet to hang himself. Officers found his body while conducting their after-dinner rounds. By then, however, they could not save him.

Representing Lovell's estate, Lovell's father brought this lawsuit under 42 U.S.C. § 1983 and the Americans with Disabilities Act (ADA). (We will refer to the plaintiff as the "Estate" to

distinguish Lovell from his father.)  The Estate sued O'Neil, Integrated Services of Kalamazoo (O'Neil's employer), Kalamazoo County, and five corrections officers.  It alleged that the individual defendants had violated the Due Process Clause by acting with deliberate indifference to the risk that Lovell would commit suicide.  And it sought to hold Integrated Services and Kalamazoo County liable for this constitutional violation under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  The Estate separately sought to hold these two defendants liable for failing to accommodate Lovell's disability under the ADA.

All defendants moved for summary judgment.  A magistrate judge recommended granting qualified immunity to the five corrections officers but denying it to O'Neil.  *See Lovell v. Kalamazoo County*, 2024 WL 4480096, at *3–15 (W.D. Mich. Aug. 5, 2024).  The magistrate judge also recommended granting summary judgment to the two government entities because the Estate failed to make out its *Monell* and ADA claim.  *See id.* at *15–19.  The district court adopted the magistrate judge's recommendations in full.  *See Lovell v. County of Kalamazoo*, 2024 WL 4182018, at *5 (W.D. Mich. Sept. 13, 2024).  O'Neil immediately appealed.  We review the district court's denial of her request for qualified immunity de novo.  *See Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 925 (6th Cir. 2024).

II

To overcome O'Neil's qualified-immunity defense, the Estate must establish two things.  It must show that O'Neil violated the Constitution.  *See Hehrer v. County of Clinton*, 161 F.4th 955, 962 (6th Cir. 2025).  And it must show that the existing law would have "clearly established" this violation when O'Neil acted.  *Id.*  If § 1983 plaintiffs fail to identify the clearly established law that underlies their constitutional theory, we may skip the first of these requirements and resolve the appeal on that "'clearly established' requirement" alone.  *Lawler*, 93 F.4th at 925.  We opt to take that approach here because our "controlling legal rules" were anything but clear at the critical time.  *Id.*

The status of inmates confined in a correctional facility determines the constitutional right that protects them.  *See Kingsley v. Hendrickson*, 576 U.S. 389, 400–01 (2015).  The Eighth Amendment's ban on "cruel and unusual punishments" applies to convicted prisoners who have

already received punishment for a crime.  U.S. Const. amend. VIII; *see Whitley v. Albers*, 475 U.S. 312, 318 (1986).  But the Fourteenth Amendment's ban on "depriv[ing]" any "person" of "life" or "liberty" "without due process of law" applies to pretrial detainees whom a court has yet to punish.  U.S. Const. amend. XIV, § 1; *see Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).

Our view of how these two rights relate to each other has evolved over time.  For decades, we assumed that the two provisions set the same ground rules for claims that corrections officers failed to adequately protect inmates from harm.  *See Lawler*, 93 F.4th at 927 (citing cases); *see also, e.g.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998).  But the Supreme Court then set more lenient rules for a pretrial detainee's excessive-force claim against a corrections officer as compared to a convicted prisoner's similar claim.  *See Kingsley*, 576 U.S. at 400–02.  And we have since relied on *Kingsley* to adopt more lenient standards for a pretrial detainee's claim that corrections officers failed to adequately protect the detainee from harm. *See Brawner v. Scott County*, 14 F.4th 585, 591–97 (6th Cir. 2021).  That said, our full court recently agreed to reconsider the standards that should govern a detainee's failure-to-protect claim.  *See Poynter ex rel. Fernandez v. Bennett*, 169 F.4th 716 (6th Cir. 2026) (en banc) (order).

By resolving the Estate's claim at step two of the qualified-immunity analysis, we can avoid this evolving body of law.  *See Lawler*, 93 F.4th at 925–26.  That step requires the Estate to show that O'Neil violated clearly established law "at the time" she examined Lovell.  *Id.* at 927 (citation omitted).  And she interacted with Lovell in 2020 when we still assumed that pretrial detainees must meet the same constitutional rules as convicted prisoners.  *See id.*  To show a violation of clearly established law at that time, then, the Estate must establish that O'Neil's conduct violated the more demanding standards that apply to those prisoners.  *See id.* at 928.  Not only that, the Estate must show that "every reasonable official" in O'Neil's position would have found that her conduct violated these more demanding standards.  *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (citation omitted).

The Estate has not done so.  In 2020, plaintiffs had to prove three things to hold corrections officers liable for the failure to prevent an inmate's suicide.  *See Lawler*, 93 F.4th at 928–29; *Beck v. Hamblen County*, 969 F.3d 592, 600 (6th Cir. 2020).  Objectively, the plaintiffs had to show that the inmate "faced a 'substantial risk of serious harm' before" the suicide.

*Lawler*, 93 F.4th at 928 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Subjectively, they had to show that the corrections officers personally believed that there was a "strong likelihood" that the inmate would commit suicide. *Id.* at 929. Lastly, the plaintiffs had to show that the officers "responded" to this known suicide risk in such an inadequate way that their actions exceeded "ordinary negligence." *Campbell v. Riahi*, 109 F.4th 854, 860 (6th Cir. 2024); *see Lawler*, 93 F.4th at 929.

This case does not require us to consider the first two of these requirements. As for the objective inquiry, O'Neil admitted that Lovell faced a serious risk of suicide before he took his life. As for the subjective inquiry, the parties spend substantial time disputing O'Neil's mindset about Lovell's suicide risk. She undoubtedly recognized a "*possibility*" that he might try to kill himself. *Downard ex rel. Downard v. Martin*, 968 F.3d 594, 601 (6th Cir. 2020) (citation omitted). But did she also believe that the required "*strong likelihood*" existed that he would take his life? *Id.* (citation omitted). We see no need to answer this question.

Our reason? The Estate has failed to meet the third requirement—at least not when we analyze that requirement at step two of the qualified-immunity framework. It is not "beyond debate" that O'Neil responded unreasonably to Lovell's suicide risk. *Beck*, 969 F.3d at 601 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). To explain why, we start (and largely end) with the "circumstances" that O'Neil faced. *Wesby*, 583 U.S. at 65 (citation omitted).

O'Neil strived to "balance competing" objectives. *Campbell*, 109 F.4th at 861. On the one hand, she knew some troubling things about Lovell. An officer had told her that a hospital's psychiatric unit had admitted Lovell for suicidal ideation just before he came to the jail. She had also learned that Lovell had started a fire at the hospital. And her review of Lovell's records with Integrated Services had revealed his ongoing mental-health struggles, including his prior suicide attempts. She also knew that his suicidal ideation "could return" at any time. O'Neil Dep., R.84-12, PageID 1446. For these reasons, she originally placed him in a padded cell with a suicide-prevention gown.

On the other hand, Lovell had denied "feeling suicidal" when O'Neil evaluated him the next day. O'Neil Note, R.84-11, PageID 1430. This evaluation also led O'Neil to have an additional concern: the padded cell and suicide-prevention gown were "causing him more distress." O'Neil Dep., R.84-12, PageID 1451. Lovell repeatedly asked "to have underwear and clothing to wear" because of the "discomfort" that the gown caused. *Id.* O'Neil also could tell "how anxious he was" from remaining in the padded cell. *Id.*, PageID 1459. She thus recognized that she needed to make a placement decision that considered Lovell's overall "mental health status," including the anxiety and annoyance caused by his current accommodations. *Id.*

These dueling concerns led O'Neil to decide on a compromise. To relieve his distress, she relocated Lovell to a medical cell and gave him a jumpsuit. To reduce his suicide risk, she took several measures. She indicated that he should have only a suicide-prevention blanket, not regular bedding, in that cell. She also had another social worker reexamine him later in the day to ensure that his suicidal ideation had not returned. And she asked the tower to put his cell continuously on a camera screen. Finally, she encouraged corrections officers to interact with him frequently.

We know of no case that would have "put [O'Neil] on notice that" this compromise solution qualified as the type of unreasonable response that could render her liable. *Rivas-Villegas*, 595 U.S. at 6. Even officials who respond "carelessly" to a risk do not necessarily respond in a deliberately indifferent way. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). And a reasonable person could believe that O'Neil did not respond carelessly. She did not simply ignore the suicide risk. Rather, she sought to reduce that risk using methods (such as the use of a suicide-prevention blanket) that accounted for her "competing" concerns (such as Lovell's ongoing discomfort from the padded cell). *Campbell*, 109 F.4th at 861. Even if O'Neil could have reduced the suicide risk further, we cannot describe her chosen course of action as so deficient that "every reasonable official" would have recognized that it rose above the "ordinary negligence" level. *Rivas-Villegas*, 595 U.S. at 5 (citation omitted); *Campbell*, 109 F.4th at 860.

If anything, our prior cases support O'Neil rather than the Estate. We have granted qualified immunity to an officer who sought to balance an inmate's risk of suicide against other

"exigencies" (such as the risk that the inmate would get into a fight). *Campbell*, 109 F.4th at 861. And we have granted qualified immunity to a jail psychologist who provided an inmate with a suicide-prevention blanket even though the psychologist could have done more to reduce the suicide risk. *See Galloway v. Anuszkiewicz*, 518 F. App'x 330, 335 (6th Cir. 2013).

None of the Estate's decisions supports a contrary conclusion. The Estate cites *Comstock* as its best case. There, a psychologist originally diagnosed an inmate as suicidal and ordered several precautions, including that the inmate wear a suicide-prevention gown. *Comstock*, 273 F.3d at 698. After a cursory meeting the next day, however, the psychologist changed his mind about the inmate's suicide risk and removed all suicide-prevention measures. *Id.* at 699. Several hours later, the inmate committed suicide. *Id.* We held that a reasonable jury could find that the psychologist still believed the inmate posed a high suicide risk on the fateful second day. *Id.* at 704–06. We added that a reasonable jury could also find that the psychologist responded with deliberate indifference to this risk. *Id.* at 706–11. These facts show that *Comstock* turned on the psychologist's subjective state of mind because he took *no* precautions to prevent the inmate's suicide after the meeting on the second day. *Id.* at 709–10. Here, by contrast, O'Neil's defense does not turn on that subjective prong alone. To the contrary, even if she believed that Lovell posed a high suicide risk, she *did* take "precaution[s] to account for that possibility." *Id.* at 710. Although the Estate criticizes O'Neil for failing to do *more*, the psychologist in *Comstock* did *nothing* after the second evaluation. So *Comstock* cannot clearly establish O'Neil's deliberate indifference. Indeed, because the suicide-prevention measures had not increased the distress of the inmate in *Comstock*, that case did not confront the situation that O'Neil faced: the need to "balance" a suicide risk against additional mental-health concerns. *Campbell*, 109 F.4th at 861.

The Estate fares even worse by relying on *Finley v. Huss*, 102 F.4th 789 (6th Cir. 2024). In that case, officials decided to keep a mentally ill inmate in solitary confinement for several months because of the inmate's repeated prison infractions and efforts to obtain contraband to harm himself. *See id.* at 802–04, 806–07. Yet segregation had previously caused the inmate so much distress that he had tried to commit suicide by swallowing razor blades. *See id.* at 799–801. We thus held that a reasonable jury could find that the officials had acted with deliberate indifference to the risk that this continued segregation would harm the inmate's "mental health."

*Id.* at 805–07. But a reasonable official could read this conclusion as justifying (rather than undermining) O'Neil's actions. She recognized that, like the segregation in *Finley*, Lovell's placement in a padded cell was causing him "distress." O'Neil Dep., R.84-12, PageID 1451. If she had refused to take these mental-health concerns into account, Lovell might have sued her on the same theory that the *Finley* inmate pursued. Nothing in *Finley*, by contrast, supports a claim that O'Neil should face liability for trying to alleviate harm to Lovell's mental health.

The Estate next turns to two unpublished decisions. *See Bryant v. Hensley*, 2024 WL 1180440, at *2–4 (6th Cir. Mar. 19, 2024); *Linden v. Washtenaw County*, 167 F. App'x 410, 423–26 (6th Cir. 2006). Yet "unpublished cases" do not clearly establish anything because they do not even bind us—let alone state officials. *Campbell*, 109 F.4th at 861 (citation omitted). Besides, these cases do not show that O'Neil violated clearly established law for the same reasons. Like the psychologist in *Comstock*, the officers in *Bryant* "failed to take any action to protect" an inmate from a suicide risk. *Bryant*, 2024 WL 1180440, at *3. O'Neil, by contrast, took several protective actions. And like the prison officials in *Finley*, the officer in *Linden* transferred a suicidal prisoner to an isolation cell even though the officer knew that this isolation would increase the prisoner's mental distress. *Linden*, 167 F. App'x at 414. O'Neil, by contrast, removed Lovell from the padded cell that was causing him distress.

Unable to identify analogous precedent, the Estate also points out that § 1983 plaintiffs need not produce "a case identical in facts" to overcome a qualified-immunity defense. Appellee's Br. 36. That is true but irrelevant. The Estate correctly notes that a general principle (such as the ban on acting with deliberate indifference to a prisoner's suicide risk) can clearly establish a violation in "an obvious case" when every reasonable official would immediately recognize that a defendant's conduct violated the principle. *Williams v. City of Canton*, 168 F.4th 933, 942 (6th Cir. 2026) (quoting *Rivas-Villegas*, 595 U.S. at 6). If, however, a general principle does not immediately resolve the constitutional question when applied to "the particular circumstances" that a state official faced, plaintiffs must point to cases with similar facts. *Wesby*, 583 U.S. at 63. And here, the general principle that defendants can violate the Constitution if they recklessly respond to a suicide risk does nothing to answer the specific question whether O'Neil's particular actions were reckless. *See Farmer*, 511 U.S. at 844; *Campbell*, 109 F.4th at

860.  So the Estate's failure to identify analogous caselaw forecloses its effort to hold O'Neil liable on this case's facts.

The Estate lastly raises a challenge to our jurisdiction.  The collateral-order doctrine restricts the issues that we may review in O'Neil's interlocutory appeal.  *See Williams*, 168 F.4th at 937–38.  In some circumstances, we may not review a district court's conclusion that the summary-judgment record would permit a jury to find a historical fact relevant to the legal claims.  *See id.* at 938.  The Estate alleges that this rule applies here because O'Neil challenges the district court's conclusion that a reasonable jury could rule against her on a "question of fact": whether she subjectively believed that a strong likelihood existed that Lovell would commit suicide.  *Farmer*, 511 U.S. at 842.  As we have said, however, we may simply assume this subjective element in Lovell's favor to resolve this appeal.  That is because O'Neil also argues that the existing precedent did not "clearly establish[]" that she responded to Lovell's suicide risk in a way that evinced deliberate indifference.  *Williams*, 168 F.4th at 938 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014)).  And that type of legal claim falls squarely within our jurisdiction under the collateral-order doctrine.  *See id.*; *Beck*, 969 F.3d at 604.

\* \* \*

In retrospect, should O'Neil have taken more precautions?  Perhaps so.  But qualified immunity exists to insulate state officials from damages liability when their conduct falls within the gray areas of the law.  *See Rivas-Villegas*, 595 U.S. at 7.  At most, O'Neil's conduct fell within such a gray area here.  We thus reverse the district court's denial of qualified immunity and remand for further proceedings consistent with this opinion.