RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0148p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

ALEXANDRE ANSARI,

　　　　　　　　　　*Plaintiff-Appellee*,

　　　*v.*

MOISES JIMENEZ,

　　　　　　　　　　*Defendant-Appellant*.

No. 24-1743

———————————

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-10719—Stephen Joseph Murphy III, District Judge.

Argued: December 10, 2025

Decided and Filed: May 14, 2026

Before: BATCHELDER, GILMAN, and LARSEN, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellant. Beth A. Wittmann, GRANZOTTO & WITTMANN, P.C., Berkley, Michigan, for Appellee. **ON BRIEF:** Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellant. Beth A. Wittmann, GRANZOTTO & WITTMANN, P.C., Berkley, Michigan, for Appellee.

———————————

## OPINION

———————————

LARSEN, Circuit Judge. Alexandre Ansari was convicted in Michigan state court of first-degree murder and two counts of assault with intent to commit murder. He was sentenced to life in prison without the possibility of parole. But a review conducted by the local prosecutor's office later concluded that Ansari was not guilty of the crimes. In response, the

state court vacated Ansari's convictions and sentence pursuant to a stipulated order. Ansari then filed this federal action against Moises Jimenez, the detective who investigated the crimes. Ansari alleged that Jimenez failed to disclose material exculpatory evidence in violation of Ansari's constitutional rights. A jury found for Ansari and awarded him $10 million in damages. Jimenez now appeals. We AFFIRM.

I.

The events that led to Ansari's conviction began on September 22, 2012, when Rosalind Barley and her younger sister, Ileana Cuevas, drove to Miguel Figueroa's home in Detroit, Michigan. *People v. Ansari*, 2015 WL 630388, at *1 (Mich. Ct. App. Feb. 12, 2015). Barley testified at Ansari's criminal trial that when they arrived, Figueroa, who was Barley's boyfriend, got in the back seat of the car. Barley then "heard a series of loud noises that sounded like fireworks." *Id.* Barley testified "that she did not immediately realize the noises were gunshots hitting her vehicle; however, after looking out the passenger window, she saw [Ansari] across the street holding a long gun." *Id.* Figueroa also testified that he saw Ansari fire a weapon toward the vehicle. *Id.* Figueroa quickly got out of the car and Barley drove away. *Id.* Barley then realized that Cuevas had been shot. *Id.* Figueroa tried to flee but was shot twice as he was running away. *Id.* Figueroa "testified that after being shot, he turned around in order 'to get a good look at [the shooter] again,' and was then shot in the face." *Id.* (alteration in original). He nonetheless survived. Cuevas, however, died from the gunshot wound. *Id.*

Barley and Figueroa were each shown photographic arrays not containing Ansari's picture. *Id.* Neither could identify the shooter. *Id.* Later, Figueroa was shown a photographic array that did include Ansari, and Figueroa identified Ansari as the shooter. *Id.* Barley was shown the same array, but she could not identify the shooter. *Id.* At a subsequent live lineup, however, both Barley and Figueroa identified Ansari as the shooter. *Id.* At trial, they did the same. *Id.* at *2.

Ansari attempted to counter the in-court identification with the testimony of Leola Marlowe. Marlowe had heard the gunshots and had seen "a man with a gun run down the alley . . . , place the gun in the trunk of a car, and drive away." *Id.* Marlowe testified that the

man she saw was a "a big man – a heavy man," who was close to 300 pounds and "really tall." R. 64-15, Trial Tr., PageID 1325.  This was consistent with witness identifications of the shooter during the investigation, which described the shooter as possibly 6 feet tall and "fat (not sloppy) 300 lbs," R. 64-3, Witness Statement, PageID 1207–09, and as "a heavy set black male about 6 foot tall," R. 64-5, Crime Report, PageID 124.  Ansari is around 5'11" tall but weighs around 175 pounds.  Marlow testified that she knew Ansari from the neighborhood and that he was not the person she saw because Ansari "is too small."  R. 64-17, Trial Tr., PageID 1352.  The prosecution called Moises Jimenez, the City of Detroit police detective who investigated the murder, to rebut Marlowe's testimony.  *Ansari*, 2015 WL 630388, at *2.  He "testified that when he interviewed Marlowe immediately after the shooting she was nervous, shaky, and scared."  *Id.*

Ansari was convicted of first-degree murder and two counts of assault with intent to commit murder.  *Id.* at *1.  He was sentenced to life in prison without the possibility of parole. *Id.*  The Michigan Court of Appeals affirmed, *id.*, and the Michigan Supreme Court denied leave to appeal, *People v. Ansari*, 869 N.W.2d 590 (Mich. 2015) (mem.).  Ansari then filed a habeas petition in federal district court.

Four days after Cuevas's death, Tommy Edwards, Figueroa's brother, was shot and killed.  Jimenez, who investigated the Cuevas murder, also investigated the Edwards murder. Ultimately, Ansari was tried for the Edwards murder, but a jury acquitted him.

Ansari continued to profess his innocence of the Cuevas murder as well.  And, in 2018, the Wayne County Prosecutor's Office Conviction Integrity Unit (CIU) began an investigation. An attorney at the CIU drafted a memorandum that concluded that Jose Sandoval, Barley's ex-boyfriend, likely had orchestrated the shootings.  The memo explained:

> [The Cuevas and Edwards] cases must be viewed together inasmuch as they provide the background and support for the recommendation of the CIU.  The murders were set in motion after Rosalind Barley and her new boyfriend, Miguel Figueroa[,] allegedly stole 3.5 grams of raw heroin from Barley's ex-boyfriend, Jose Sandoval, in the Spring/Summer of 2012.  Sandoval, a known drug dealer with significant ties to a Mexican Cartel, was being investigated by the DEA at the time of the murders.  As a result, trackers were placed on two of his cars and his cell phones were confiscated when he was arrested for a violation of his supervised release on federal drug charges.  A recent CIU review of the tracker

and phone data, as well as new witness interviews, contribute significantly to our conclusion that Jose Sandoval arranged for these killings, and that persons other than Mr. Ansari carried them out.

R. 64-19, CIU Memo, PageID 1374. The memo further explained that "victims Barley and Figueroa are now believed to have also been sabotaging the investigation: concealing their theft of Sandoval's heroin, and deliberately throwing off the investigation of the real perpetrators by offering bogus descriptions, and ID's, of the shooter." *Id.* at 1378. The memo was particularly critical of Jimenez, whom CIU investigators interviewed. The memo explained that Jimenez "has now admitted to deliberately failing to investigate Jose Sandoval because Sandoval is tied to a powerful Mexican drug cartel. Jimenez has family in Mexico, and Jimenez feared his family would be killed." *Id.* at 1377. According to the CIU, "[t]his distorted every aspect of his investigation and the truth-finding process." *Id.*

Soon after, the Wayne County Prosecutor and Ansari filed a stipulated order in state court to dismiss the charges against Ansari. A Wayne County Circuit Judge then entered the following order:

> This matter having been presented in open court through the stipulation of the parties, and the parties hav[ing] agreed that newly discovered evidence, as well as the Wayne County Prosecutor's own investigation, warrants relief, and the Court being otherwise fully advised in the premises of said stipulation;
>
> IT IS HEREBY ORDERED that in the interests of justice, Alexandre Ansari's convictions and sentences in this matter are hereby vacated, and all related charges are hereby dismissed. Mr. Ansari shall be released from the Michigan Department of Corrections forthwith.

R. 75-1, Stipulated Order, PageID 1909.

Ansari was released from prison on March 15, 2019. A few days later, the federal district court dismissed Ansari's previously filed habeas petition as moot, given that his "conviction and sentence ha[d] been vacated based on newly discovered evidence of actual innocence, and the charges dismissed." R. 75-4, Order, PageID 1922.

Once released from prison, Ansari brought this civil action under 42 U.S.C. § 1983, alleging that Jimenez and the City of Detroit had violated his constitutional rights. The district court dismissed the City from the case with prejudice. And, after protracted litigation, Ansari's

case against Jimenez boiled down to one issue—whether Jimenez had violated Ansari's Fourteenth Amendment rights by withholding material and exculpatory information under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).

Trial began in June 2023 but soon ended in a mistrial.  A second trial began in February 2024.  This time, the jury found for Ansari and awarded him $10 million in damages.  During trial, Jimenez moved for judgment as a matter of law.  The district court denied the motion.  After judgment was entered, Jimenez moved for a new trial and filed a renewed motion for judgment as a matter of law.  The district court denied the motions.  Jimenez now appeals.

## II.

Jimenez makes three claims on appeal: (1) Ansari's § 1983 claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994); (2) Jimenez is entitled to qualified immunity; and (3) Jimenez is entitled to a new trial.  We address each in turn.

## A.

Jimenez first argues that *Heck v. Humphrey*, 512 U.S. 477 (1994), bars Ansari's § 1983 claim.  Jimenez raised his *Heck* argument in a motion to dismiss, in a motion for judgment as a matter of law, and in a renewed motion for judgment as a matter of law.  We review the district court's decision on all such motions de novo.  *See In re Fifth Third Early Access Cash Adv. Lit.*, 925 F.3d 265, 275 (6th Cir. 2019); *Pouillon v. City of Owosso*, 206 F.3d 711, 719 (6th Cir. 2000).[1]

"The *Heck* doctrine addresses a common situation."  *Chaney-Snell*, 98 F.4th at 707.  Convicted defendants often sue under § 1983, claiming "that public officials violated the Constitution while investigating or prosecuting" them.  *Id.*  When a § 1983 litigant seeks "a

---

[1]The parties and the district court discuss the *Heck* issue as pertaining to the court's subject-matter jurisdiction.  But panels of this court have recently treated the *Heck* bar as non-jurisdictional.  *See Chaney-Snell v. Young*, 98 F.4th 699, 707–11 (6th Cir. 2024); *see also Kitchen v. Whitmer*, 106 F.4th 525, 533–34 (6th Cir. 2024) ("[W]e have recently implied that *Heck* is not jurisdictional.").  Whether the *Heck* bar is jurisdictional does not matter in this case because either way (1) we review the issue first, (2) we review it de novo, and (3) the *Heck* issue is squarely presented for our review.  *Cf. Kitchen*, 106 F.4th at 536 (considering whether the defendants had forfeited the *Heck* issue).

purely prospective remedy," *Heck* poses no barrier to the lawsuit. *Olivier v. City of Brandon*, 146 S. Ct. 916, 920 (2026). But *Heck* prevents "the use of § 1983 to challenge the validity of a prior conviction or sentence so as to obtain release from custody or monetary damages." *Id.* So when a litigant seeking such a remedy brings a lawsuit that "would necessarily imply the invalidity of" the underlying conviction, *Heck* bars the lawsuit unless the plaintiff "can demonstrate that the conviction or sentence has already been invalidated." *Heck*, 512 U.S. at 487. That is, the plaintiff must show "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.'"[2] *Id.*

The *Heck* bar does not apply here. Ansari's lawsuit does seek damages. And we assume, as do the parties, that success on Ansari's due process claim would imply the invalidity of his state court convictions and sentence. *Cf. Richmond v. Mosley*, 2024 WL 2862505, at *2 (6th Cir. June 6, 2024). But a cursory review of the procedural history shows that Ansari's convictions and sentence have in fact been "invalidat[ed]." *Heck*, 512 U.S. at 487.

The Wayne County Circuit Court order is clear and unambiguous—it states that "Ansari's convictions and sentences in this matter are hereby vacated, and all related charges are hereby dismissed." R. 75-1, Stipulated Order, PageID 1909. The Circuit Court's Register of Actions reflects this with the following notation—"Original Conviction Vacated." R. 75-2, Register, PageID 1913. And, consistent with the Circuit Court's order that "Mr. Ansari shall be released from the Michigan Department of Corrections forthwith," R. 75-1, Stipulated Order, PageID 1909, Ansari was released from prison on the day the state court order entered. So there can be little doubt that Ansari's convictions and sentence have been invalidated. Ansari's civil "action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal

---

[2]It's not clear that the methods listed in *Heck* are the only ways to show that a conviction or sentence has been invalidated. Our court has suggested that these may just be *examples* of ways to overturn a conviction. *See Carr v. Louisville-Jefferson County*, 37 F.4th 389, 394–95 (6th Cir. 2022) ("*Heck* did not impose a prerequisite of innocence to seek relief under § 1983. Instead, it gave examples of state procedures amounting to invalidation of a conviction. . . . [N]one of the examples in *Heck* require innocence or complete elimination of the fact of conviction.").

judgment against" him.  *Heck*, 512 U.S. at 487 (emphasis in original).  So the *Heck* bar does not apply.

Jimenez contests this conclusion.  He argues that the state court order vacating Ansari's conviction and sentence was not procedurally proper under Michigan law.  Therefore, he says, the Michigan circuit court was not "a state tribunal authorized to" declare Ansari's conviction invalid.  *Id.* at 486–87.  This argument misses the mark.

Post-appeal relief in Michigan is governed by Michigan Court Rules (M.C.R.) 6.500, *et seq.*  The procedures for motions to set aside or modify a judgment are set forth in M.C.R. § 6.502.

Did Ansari and the state court comply with the procedures for setting aside a judgment when overturning Ansari's convictions and sentence?  Possibly not.  We need not decide that question, however, because *Heck* gives us no license to disregard the state court's final judgment on the ground that the state court failed to follow its own procedures.

Applying the *Heck* bar to preclude Ansari's § 1983 claim would be inconsistent with the reasons for the doctrine.  The *Heck* bar exists in part "to avoid conflicting resolutions of state criminal cases and federal civil rights proceedings."  *Aprileo v. Clapprood*, 158 F.4th 317, 325 (1st Cir. 2025) (citation modified); *Heck*, 512 U.S. at 484.  So *Heck* requires that the plaintiff's conviction be "sufficiently invalidated to avoid parallel litigation and an inappropriate collateral attack on a conviction."  *Carr v. Louisville-Jefferson County*, 37 F.4th 389, 395 (6th Cir. 2022).  And that is the case here.  The state court's judgment has wiped Ansari's convictions and sentence from the books and has ordered his release from prison.  So Ansari's federal suit poses no risk of parallel proceedings or conflicting resolutions.

But Jimenez's proposal does.  He urges us to second-guess the validity of the state court judgment on the ground that the state court did not properly follow its own procedures.  The result, we suppose, would be to leave Ansari with an "outstanding criminal judgment" for federal purposes, *Heck*, 512 U.S. at 487, but a vacated one for state purposes.  That turns *Heck* on its head and subverts a core purpose of the doctrine: to enforce the "strong judicial policy against

the creation of two conflicting resolutions arising out of the same or identical transaction." *Id.* (citation omitted). Jimenez has cited no caselaw suggesting that *Heck* requires such a result.

Contrast this case with *Bolick v. Pennsylvania*, 473 F. App'x 136 (3d Cir. 2012). There, a § 1983 plaintiff argued that his state court conviction had been invalidated by an order of the state trial court. *Id.* at 138. But the Third Circuit held that his claim was *Heck*-barred because a state appellate court had concluded that the "order was unauthorized." *Id.* at 139. Because the trial court's order was a "legal nullity," *id.* at 138, the plaintiff's conviction remained valid, and a judgment in his favor "would necessarily imply the invalidity of [his] conviction," *id.* at 139. Here, although Jimenez argues that the state court order was a legal nullity, no state appellate court has determined as such. And it is not for this court to revisit the state court judgment.

For these reasons, the district court didn't err by allowing Ansari's § 1983 claim to proceed.

B.

Jimenez next argues that the district court erred by denying him qualified immunity on Ansari's claim under *Brady v. Maryland*, 373 U.S. 83 (1963).[3] A *Brady* claim has "three elements: '[1] the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 814 (6th Cir. 2019) (alterations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). We have held that the "[p]olice share this obligation." *Est. of Andrews v. City of Cleveland*, 112 F.4th 436, 443 (6th Cir. 2024). At trial, Ansari argued that Jimenez had failed to disclose information regarding Sandoval's potential role in the shooting, including, among other things, Sandoval's status as a major drug dealer, the fact that Sandoval was nearby on the night of the shooting but had no communication with Ansari, and the fact that the only eye-witnesses, Figueroa and Barley, had recently stolen heroin from Sandoval (collectively, "the Sandoval information").

---

[3]For ease, we refer to Ansari's claim as a *Brady* claim, but to the extent the allegedly withheld evidence would have been used to impeach witnesses at trial, the obligation stems from *Giglio v. United States*, 405 U.S. 150, 154 (1972).

We review the district court's denial of qualified immunity de novo. *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001). A qualified immunity analysis asks "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established" at the time of the relevant conduct. *Harris v. Klare*, 902 F.3d 630, 637 (6th Cir. 2018) (citation omitted). The court may grant qualified immunity on either basis. *Pearson v. Callahan*, 555 U.S. 223, 241–42 (2009).

On appeal, Jimenez focuses on the clearly established prong. He makes two arguments in this regard.

First, citing Fourth Circuit caselaw, Jimenez briefly contends that in 2012, when the acts here occurred, it was not clearly established that police officers had independent duties under *Brady*. *See* Appellant Br. at 47 (citing *Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000) (en banc) (affirming by an equally divided court)). Yet Jimenez acknowledges that our circuit has deemed a police officer's *Brady* duties "clearly established" since 1990. *See Moldowan v. City of Warren*, 578 F.3d 351, 382 (6th Cir. 2009).

To square this circle, Jimenez argues that, in the years following *Moldowan*, the Supreme Court has suggested that circuit court cases cannot create a clearly established right; only Supreme Court caselaw will do. It is true that the Supreme Court has questioned whether circuit precedent can suffice. *See, e.g.*, *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021). But it has never squarely held that circuit precedent is insufficient. So we must follow our own precedent, which has repeatedly concluded that published caselaw from this court may create a clearly established right. *See, e.g.*, *Campbell v. Riahi*, 109 F.4th 854, 860 (6th Cir. 2024). *Moldowan* held in 2009 that police officers' Brady-derived duties were "clearly established" as far back as 1990. 578 F.3d at 382. We are bound by *Moldowan*; so this claim fails.

Next, Jimenez contends that Ansari has produced no case that would have put Jimenez on notice that *Brady* required him to turn over the particular "kind of information at issue" in this case, which he describes as "uncorroborated rumors and anonymous tips." Appellant Br. at 37, 47. This court recently considered a similar argument, albeit at the summary judgment stage. In *Clark v. Louisville-Jefferson County Metro Government*, the defendant, a forensic scientist at a

police crime lab, argued that he was entitled to qualified immunity because "no case ha[d] clearly established" a *Brady* duty to turn over the *kind* of evidence he had failed to disclose—his "'unfinished notes' that contain[ed] only initial 'thoughts and impressions.'" 130 F.4th 571, 583 (6th Cir. 2025) (per curiam) (citation omitted). This court rejected that argument. "Contrary to [the defendant's] claim," *Clark* held that our "cases do not require plaintiffs to identify a decision that addressed exactly the same type of *Brady* evidence." *Id.* The parties do not discuss *Clark*. And we need not decide whether *Clark*'s reasoning applies here because Jimenez did not raise this argument in his Rule 50(a) motion below. So it is not preserved for appeal.

"[A] party seeking a qualified-immunity defense must continue to urge it during and after trial in order to avoid forfeiting the argument on appeal." *Ayers v. City of Cleveland*, 773 F.3d 161, 167 (6th Cir. 2014). The failure to do so forfeits the defense. *See Sykes v. Anderson*, 625 F.3d 294, 304 (6th Cir. 2010).

During his oral new trial motion, Jimenez primarily argued that there was no constitutional violation because he had turned over the purported *Brady* material, and, in any event, the information was neither material nor exculpatory. Then, with respect to the "clearly established" prong, Jimenez made two arguments. He argued that because the circuits were split on the point, *Moldowan*'s holding on a police-officer's *Brady* duties could not clearly establish the law. And he briefly mentioned the clearly established prong in response to the district court's question regarding *Brady*'s applicability to charging decisions. But he never argued what he claims now: that no clearly established law would have alerted him that the particular kind of information he withheld—"the Sandoval evidence providing a motive for the shooting" and "uncorroborated rumors and anonymous tips"—counted as *Brady* information. Appellant Br. at 32. His failure to properly present his claim in his Rule 50(a) motion means that he forfeited it. *See Sykes*, 625 F.3d at 304; *see also Ayers*, 773 F.3d at 167. After all, the point of Rule 50(a) is to give the opposing party and the district court "the opportunity to simplify the trial by resolving some issues, or even all issues, without submission to the jury." *Ford v. County of Grand Traverse*, 535 F.3d 483, 492 (6th Cir. 2008) (citation omitted). Jimenez never gave the district court that chance.

Jimenez contests this conclusion.  He points out that, in *Sykes*, this court held that the defendants' Rule 50(a) motion had not preserved their qualified immunity claim "because the Defendants 'never mentioned 'qualified immunity,'" "clearly established law," or similar terms "that might have put the court and the Plaintiffs on notice as to the Defendants' qualified-immunity claim."  625 F.3d at 304.  That is an apt description of *Sykes*, but it does not save Jimenez's case.  *Sykes* does not stand for the proposition that the mere "mention" of "qualified immunity" in a Rule 50(a) motion suffices to preserve any and all qualified immunity claims for a post-trial motion or for appeal.  The import of *Sykes* is that the Rule 50(a) motion must have done enough to "put the court and the Plaintiffs on notice as to the Defendants' qualified-immunity claim."  *Id*.  Jimenez's incantation of "qualified immunity" with respect to two starkly different arguments was not sufficient to preserve the claim he now makes on appeal.

The district court didn't err by denying qualified immunity to Jimenez on Ansari's *Brady* claim.

## C.

Finally, Jimenez challenges the denial of his motion for new trial.  We review the denial of such motions using the abuse-of-discretion standard.  *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 379 (6th Cir. 2022) (per curiam).  The same standard generally governs our review of a district court's evidentiary rulings.  *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009).  "A district court abuses its discretion when it relies on clearly erroneous findings of fact, applies the law improperly or uses an erroneous legal standard."  *Caudill Seed*, 53 F.4th at 379 (citation omitted).

### 1.

Jimenez argues that the district court erred by not admitting two items of evidence:  a file created by the prosecutor's office and an unredacted copy of a memorandum created by Assistant Prosecutor Erika Tusar.

Before addressing Jimenez's arguments, we offer some background.  Prior to trial, the district court prohibited the introduction of any evidence pertaining to Ansari's guilt or

innocence of the Cuevas murder.  The district court noted that "the parties *agreed* that [Ansari's] guilt or innocence of the underlying crime [was] not an issue of fact that [would] be litigated" at trial.  R. 129, Mot. in Limine Order, PageID 2921.  Moreover, the district court deemed such evidence "irrelevant to the narrow factual issue to be litigated—whether [Jimenez] turned *Brady* and *Giglio* evidence over to the Wayne County Prosecutor's Office," and thereby violated "Plaintiff's right to Due Process." *Id.*

We struggle to see how this can be right.  The jury in Jimenez's civil trial was charged with determining "whether Jimenez turned over *Brady* or *Giglio* evidence to the prosecution." *Id.*  That means that the jury had to decide two questions: (1) whether Jimenez turned over certain evidence and (2) whether that evidence, in fact, counted as *Brady* or *Giglio* evidence.  The jury instructions reveal that the jury was charged with both tasks.  But evidence counts as *Brady* or *Giglio* material only if there is "a reasonable probability" that, had the criminal jury heard the omitted evidence, "the result of the proceeding would have been different." *Akrawi v. Booker*, 572 F.3d 252, 262 (6th Cir. 2009) (citation omitted).  In other words, the jury in the civil trial had to determine, at a minimum, whether there was a reasonable probability that the jury in the criminal trial would have acquitted Ansari of the Cuevas murder if it had had access to the information Jimenez withheld.**[4]**  Of necessity, then, the jury in the civil trial would have needed to hear the evidence of Ansari's guilt and innocence that was presented to the criminal jury.  (Though any such evidence that was not presented in the criminal trial would be irrelevant.)  Nonetheless, the parties seem to have "agreed that [Ansari's] guilt or innocence of the underlying crime" would not be litigated at trial.  R. 129, Order, PageID 2921.  And they have not appealed the district court's rulings implementing that agreement.  Nor have they indicated whether the jury in the criminal trial saw any portion of the evidence that Jimenez now says should have been admitted in his civil trial.  We will evaluate Jimenez's arguments in light of these party-created limitations on our review.

---

**[4]**We say "at a minimum" because a § 1983 claim "undoubtedly requires more than the three-part test for *Brady* claims in a criminal case." *Clark*, 130 F.4th at 592 (Murphy, J., concurring).  Section 1983 "likely requires plaintiffs to prove but-for and proximate causation by connecting their injuries to the defendant's constitutional violations." *Id.*  "So plaintiffs asserting *Brady* claims under § 1983 may well have to establish more than the materiality standard (a 'reasonable probability' of a different outcome) that they must satisfy in a criminal case." *Id.* (citation omitted).  They may "have to show by a preponderance of the evidence that the jury would have acquitted them if the defendant had disclosed the exculpatory evidence." *Id.* (citation omitted).

a.

Jimenez first argues that the district court erred by excluding, under Federal Rule of Evidence 403, a 911-page file created by the Wayne County Prosecutor's Office containing information related to Ansari's alleged crimes. According to Jimenez, the file is important because it demonstrates that Jimenez tuned over "everything that he purport[ed] to have turned over back in 2012" and that the prosecutor's office timely possessed the pertinent documents that Assistant Prosecutor Tusar testified she did not have prior to trial. R. 173, Trial Tr., PageID 4859; *see also* Appellant Br. at 46.

Rule 403 permits a district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. When considering whether to admit the file, the district court first noted the parties' points of agreement: the file originated from the prosecutor's office and contained all the records in the prosecution's possession related to Ansari's criminal proceedings. But "the parties disagree[d] about when the contents of the file came into existence and who was aware of the file's contents." R. 159, Am. Order, PageID 3739. Given that, the district court declined to "admit the file into evidence because its potential probative value [was] substantially outweighed by the danger of unfair prejudice, confusing the issues, and needlessly presenting cumulative evidence." *Id.* (citing Fed. R. Evid. 403). It reasoned: "The file contains information that the Court previously ruled inadmissible," including "evidence as to Plaintiff's guilt or innocence" of the Cuevas murder, and "certain evidence related to the Tommy Edwards murder and certain evidence in Erika Tusar's memo." *Id.* at 3739–40. "Additionally, the file contain[ed] hundreds of pages that have not been summarized or presented to the jury in a way that is helpful to their understanding of the issues." *Id.* at 3740.

The district court reasonably balanced the considerations of Rule 403. Ultimately, there was too much unknown about the file—when it was compiled, who compiled it, and who knew what was in the file and when; and the file contained too much information that had been deemed irrelevant to the only issue at trial—whether Jimenez failed to disclose exculpatory and

material   evidence related to the killing of Cuevas.   So the district court didn't abuse its discretion by excluding the file.

b.

Jimenez next challenges the district court's decision to allow into evidence only one paragraph of an internal memo drafted by Assistant Prosecutor Tusar.  In October 2013, Tusar prepared a memo regarding a federal investigation of Sandoval.  Jimenez argued that the memo showed that he had provided the Sandoval information to the prosecutor prior to Ansari's trial. For its part, the district court recognized that the memo contained two types of information: (1) relevant information that went to whether Tusar knew of the Sandoval evidence, and (2) irrelevant information about the murder investigations that was "highly prejudicial and not at issue in the present trial."  R. 130, Order, PageID 2929.  So the court allowed Jimenez to "introduce only the title of the document, its caption, and paragraph seven," which discussed the then-ongoing FBI investigation into Sandoval.  *Id.*  In particular, paragraph seven showed:  (1) "[t]here was a separate FBI investigation" involving Sandoval; (2) Rosalind Barley previously dated Sandoval; (3) Sandoval was a "high ranking drug dealer"; (4) "Sandoval had an 'altercation' with Rosalind Barley, which was the subject of a domestic violence case;" (5) "Special Ops guys [] had information that [Plaintiff] was associated with" Sandoval; (6) Sandoval was prosecuted in federal court; (7) "Mr. Edwards was also a ranking drug associate"; and (8) someone believed that the above seven statements "overlapp[ed] with 'an undercover FBI situation.'"  *Id.* at 2930 (alterations in original) (citation omitted).  The district court admitted this paragraph not for the truth of the matters asserted, but merely to show "that Prosecutor Tusar was aware of the *Brady* and *Giglio* evidence" before trial.  *Id.*

Jimenez argues that the entire Tusar memo should have been admitted.  He says that by allowing only one paragraph to be introduced, the district court violated the rule of completeness. *See* Fed. R. Evid. 106 ("If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time.  The adverse party may do so over a hearsay objection.").

A review of the full memo shows that, in light of the background of this case, the district court didn't abuse its discretion by excluding the remaining portions as more unfairly prejudicial than probative. *See United States v. Corder*, 724 F. App'x 394, 406 (6th Cir. 2018) ("Rule 106 permits inclusion of other parts of the writing if, 'in fairness,' they ought to be considered. The district court's decision to redact the stipulation pursuant to Rule 403 amounts to a conclusion that 'fairness' would not be served by admitting evidence it considered unduly prejudicial."). Other than the paragraph admitted into evidence, most of the memo touches either on Ansari's alleged involvement in the irrelevant Edwards murder or in the Cuevas murder, which the district court had ruled was not at issue in the civil trial. And, given that understanding, the excluded portions of the memo would have prejudiced Ansari's case by suggesting to the jury that he did, in fact, commit one or both murders. Accordingly, the district court didn't abuse its discretion by admitting only paragraph seven of the Tusar Memo.

2.

Jimenez next brings two challenges to the verdict form and jury instructions.

The final verdict form asked: "Did Defendant, Moises Jimenez, violate Plaintiff, Alexandre Ansari's, Fourteenth Amendment right to due process?" R. 162, Jury Verdict Form, PageID 3743. Jimenez says this was error because it failed to specify that, to find for Ansari on the due process claim, it would have to conclude that Jimenez had violated Ansari's due process rights "*by withholding exculpatory evidence from the prosecutor*." R. 153, Proposed Jury Instr., PageID 3718 (emphasis added); *see also* R. 173, Trial Tr., PageID 4946–48. Jimenez argues that the lack of specificity harmed him because it permitted the jury also to consider whether Jimenez had failed to adequately investigate alternative suspects, including Sandoval, which was not a proper part of the Fourteenth Amendment *Brady* claim.

There was no error. Jimenez is right that the prosecutor frequently referenced Jimenez's failure to investigate during the trial. But the verdict form cannot be considered in isolation. "It [comes] with a user's manual: the jury instructions." *Moody v. United States*, 958 F.3d 485, 491 (6th Cir. 2020). As a result, "we evaluate the verdict form in the context of the instructions as a whole (the same way we evaluate individual statements in the instructions)." *Id.*

Here, the trial judge clearly instructed the jury that the claim against Jimenez was limited to his withholding of *Brady* information from the prosecutor. *See, e.g.*, R. 174, Jury Instrs., PageID 5085–87 ("To prevail on [the due process] claim, plaintiff must prove . . . that the defendant intentionally or inadvertently withheld exculpatory and/or impeachment evidence in plaintiff's criminal trial."); *see also id.* at 5085 ("In this case Alexandre Ansari claims that Moises Jimenez violated his 14th Amendment right to due process of law by withholding evidence."); *id.* at 5085–86 ("Plaintiff establishes a Brady violation by showing: (1) that the evidence at issue was favorable to the plaintiff; (2) that Detective Jimenez either willfully or inadvertently suppressed that evidence; and (3) that prejudice ensued."). When the verdict form is considered in conjunction with the jury instructions, there was no risk of confusion and thus no error.

Jimenez also briefly argues that he was prejudiced by the trial court's failure to instruct the jury that his lawyer was permitted to contact Tusar, a witness, during litigation. The potential need for this instruction stemmed from Tusar's testimony that she was "shocked" to have received a phone call from Jimenez's counsel after her deposition since she was represented by counsel. R. 171, Trial Tr., PageID 4549–53. Jimenez's cursory argument fails because he cannot show how any error in failing to give the instruction "concerned such an important point in the trial that its absence substantially impaired the defense." *United States v. Henderson*, 2 F.4th 593, 597 (6th Cir. 2021). All Jimenez says is that "[w]ithout [the instruction], the jury would likely have concluded that Jimenez's lawyer had engaged in wrongful conduct in trying to defend him, an erroneous belief created by Ansari's lawyer's statement and then confirmed when no instruction was given." Appellant Br. at 64. That is insufficient to show error by the district court, let alone a prejudicial one.

3.

Jimenez further argues that Ansari's counsel made improper and inflammatory arguments in closing that rendered the trial unfair. In particular, he charges that the lawyer's use of props, his appeal to the jury's emotions, his reference to his own father (a veteran) and son (a police officer), and his repeated encouragement to jurors to put themselves in Ansari's place all unfairly prejudiced the jury.

To be entitled to a new trial on this ground, Jimenez "must show both that the closing argument was improper" and "a reasonable probability that the jury's verdict was influenced by the improper argument." *Fuhr v. Sch. Dist. of City of Hazel Park*, 364 F.3d 753, 760 (6th Cir. 2004).

Ansari's closing argument certainly did take some unusual turns. But the district court didn't abuse its discretion by denying the motion for new trial. The court sustained many of counsel's objections, often cautioning Ansari's counsel and preventing him from proceeding further. To the extent Ansari's counsel erred by improperly pressing for a $20 million verdict, there was no prejudice—the jury awarded just half that amount. And finally, to the extent there were other improper-but-not-objected-to comments, they were minor enough to not sway the jury.

4.

Jimenez also briefly asserts that the trial errors cumulatively deprived him of a fair trial. For cumulative error, the court must consider the "combined effect of multiple trial errors to determine whether they are unfairly prejudicial." *Beck v. Haik*, 377 F.3d 624, 644 (6th Cir. 2004) (citation modified). Because Jimenez hasn't established any prejudicial errors by the district court, his cumulative-error argument also fails.

\* \* \*

We AFFIRM.